# 14-3376

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

* * * * *

UNITED STATES OF AMERICA,

*Appellee,*

- against -

JOSEPH VALERIO,

*Defendant-Appellant.*

* * * * *

*On Appeal from the United States District Court
for the Eastern District of New York (Central Islip)*

### DEFENDANT-APPELLANT'S MEMORANDUM IN SUPPORT OF MOTION FOR PRETRIAL RELEASE

Leonard Lato, Esq.
35 Arkay Drive, Suite 200
Hauppauge, NY 11788-3756
Telephone No.: (631) 655-5008
Attorney for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT.................................................................... 1

ISSUE PRESENTED FOR REVIEW............................................................... 1

STATEMENT OF THE CASE........................................................................ 1

ARGUMENT.................................................................................................. 7

    THE DISTRICT COURT COMMITTED CLEAR
          ERROR IN  CONCLUDING THAT VALERIO'S
          $3 MILLION, SECURITY OFFICER ENFORCED
          HOME DETENTION WAS INSUFFICIENT TO
          *REASONABLY ASSURE* THAT HE WOULD NEITHER
          FLEE NOR POSE A DANGER TO THE COMMUNITY....... 7

Standard of Review....................................................................................... 7

The Statute..................................................................................................... 8

Where the District Judge Went Wrong......................................................... 9

CONCLUSION............................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985).............................. 7

*George v. Warden*, No. 07 Civ. 147,
2008 WL 2954246 (N.D. W. Va. 2008)........................................... 17

*Payne v. United States*, No. 04-CR-87,
2009 WL 536837 (N.D. Miss. 2009).............. ................................. 17

*United States v. Baig*, 536 F. App'x 91 (2d Cir. 2013)................................. 7

*United States v. Ciccone*, 312 F.3d 535 (2d Cir. 2011).............................. 14

*United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985)............................... 14

*United States v. Drier*,
596 F. Supp. 2d 831 (S.D.N.Y. 2009)......................................... 11, 18-22

*United States v. Colorado-Cebado*, No. A-13-CR-458,
2013 WL 5852621 (W.D. Tex. Oct. 30, 2013)................................. 13

*United States v. Banki*, 369 F. App'x 152 (2d Cir. 2010)............................ 12

*United States v. Emmons*, 294 F. App'x 848 (5th Cir. 2008)....................... 14

*United States v. English*, 629 F.3d 311 (2d Cir. 2011)................................ 8

*United States v. Jameson*, 771 F. Supp. 341 (D. Kan. 1991)....................... 17

*United States v. Laduca*, No. 98-CR-399
(E.D.N.Y. Apr. 14, 1998, through Dec. 19, 2000)............................ 18

iii

*United States v. Lyles*, 195 F. App'x 919 (11th Cir. 2006)........................... 17

*United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009)................... 9-10

*United States v. Mercedes*, 254 F.3d 433 (2d Cir. 2001).......................... 8-9, 14

*United States v. Nicholson*, No. 91-CR-10027,
    1991 WL 268827 (D. Kan. 1991)..................................................... 17

*United States v. Olvera*, No. 89-50487,
    1991 WL 184789 (9th Cir. Sept. 19, 1991)........................................ 11

*United States v. Orta*, 760 F.2d 887 (8th Cir. 1985).................................... 10

*United States ex rel. S. Prawer & Company v. Fleet Bank of Maine*,
    No. 93 Civ. 165, 1996 WL 173121 (D. Me. Apr. 9, 1996................... 10

*United States v. Sabhnani*, 493 F.3d 63 (2007).............................................. 7, 11

*United States v. Schenberger*, 498 F. Supp. 2d 738 (D.N.J. 2007).............. 23

*United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987)................................... 10

*United States v. Starnes*, 157 F. App'x 687 (5th Cir. 2005)........................ 17

*United States v. Thomas*, No. 03-CR-150,
    2006 WL 140558 (D. Md. Jan.13, 2006)......................................... 14-16

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1933)............... 7

*United States v. Valerio*, No. 14-CR-94,
    2014 WL 1285890 (E.D.N.Y. Apr. 1, 2014)......................... 2-7, 9-13, 22-24

iv

**Statutes**

18 U.S.C. § 2251(e)................................................................ 2

18 U.S.C. § 3142(c)(1)(B)(I)................................................ 20

18 U.S.C. § 3142(e)(3)(E).................................................... 8

18 U.S.C. § 3142(f)............................................................. 8, 10

18 U.S.C. § 3142(f)(1)(E)..................................................... 8

18 U.S.C. § 3142(g)............................................................ 9, 22

18 U.S.C. § 3142(g)(4)....................................................... 23

18 U.S.C. § 3231................................................................ 1

28 U.S.C. § 1291................................................................ 1

**Other Authorities**

Oxforddictionaries.com, http://www.oxforddictionaries.com/us/definition/
    american_english/reasonably........................................ 11

Karankawa People, Wikipedia,
    http://en.wikipedia.org/wiki/Karankawa_people.................. 13

The Texas Chain Saw Massacre, Wikipedia,
    http://en.wikipedia.org/wiki/The_Texas_Chain_Saw_Massacre........... 13

## JURISDICTIONAL STATEMENT

Joseph Valerio appeals from an order entered in the United States District Court for the Eastern District of New York (Joseph F. Bianco, district judge). The order denied Valerio's second motion for pretrial release. The district court has scheduled Valerio's trial for November 3, 2014. Valerio is in custody.

Because the government has charged Valerio with having committed "offenses against the laws of the United States," the district court had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. In accordance with 28 U.S.C. § 1291, this Court "ha[s] jurisdiction of appeals from all final decisions of the district courts." On September 7, 2014, Valerio timely filed a notice of appeal (J.A. 65) from a final decision -- an order (J.A. 64) denying bail in a criminal case -- filed in the district court on September 8, 2014.

## ISSUE PRESENTED FOR REVIEW

The question for this Court to decide is whether the district court committed clear error when it found that Valerio's $3 million secured bail package was insufficient to reasonably assure that Valerio would return to court and would not pose a danger to the community.

## STATEMENT OF THE CASE

A grand jury has charged Valerio with the sexual exploitation and the attempted sexual exploitation of two children and with the transportation, receipt

and possession of child pornography. (J.A. 64-82.) The thirteen sexual-exploitation and attempted sexual exploitation counts are the most serious of the indictment's sixteen counts; each count carries a mandatory minimum of fifteen years' imprisonment. *See* 18 U.S.C. § 2251(e).

A factual summary of the charged criminal conduct appears in the district court's published decision. *See United States v. Valerio*, No. 14-CR-94, 2014 WL 1285890 (E.D.N.Y. Apr. 1, 2014). According to the district court:

> The charged crimes arise from defendant's alleged production of child pornography involving a then three-year old female victim in Ukraine, and his production of child pornography involving a then six-year old female victim at defendant's Smithtown, New York residence. The most serious of these charges carries a mandatory minimum of no less than 15 years imprisonment. Defendant's estimated advisory Sentencing Guidelines range, as noted during the hearing on March 6, 2014, is at least approximately 292 to 365 months of incarceration.

2014 WL 1285890, at *1. With respect to the alleged criminal conduct involving the child in Ukraine, the district court referenced the complaint of FBI Special Agent Steven Troyd. The district court stated:

> According to the complaint, beginning on or about April 2012, defendant aided and abetted the production of child pornography by a woman in Ukraine. Specifically, the complaint asserts that the woman, at defendant's request and instruction, filmed herself with her three-year-old daughter (who will be referred to as "Jane Doe # 1") doing various sexually explicit acts scripted by Valerio, and sent those videos to defendant through her mobile phone and parcel delivery service. According to the

2

> complaint, defendant and the woman also exchanged
> emails regarding the videos and sexually explicit acts.

*Id.*

At Valerio's initial appearance on the complaint, a magistrate judge detained Valerio, but "with leave to reopen and present a bail package in the future." *Id.* One week later, Valerio made a bail application before a different magistrate judge and was released. The district court recounted:

> Over the government's objection, Magistrate Judge
> Tomlinson authorized the release of defendant on bail on
> a secured bond, subject to certain conditions. Those
> conditions included, *inter alia,* (1) confessions of
> judgment totaling $3 million and secured by real property
> owned by defendant's mother, (2) confinement at his
> mother's house, (3) installation of government-approved
> surveillance equipment to permit monitoring of persons
> entering and exiting the house, and (4) a prohibition on
> the use of a computer or cell phone. Following the
> installation of the surveillance equipment, defendant was
> released on bond on February 12, 2014.

*Id.* at *2.

Thirteen days after Valerio's release, Troyd swore to a second complaint. The second complaint was based on the results of a search of Valerio's house on the date of Valerio's arrest on the first complaint. *Id.* The allegations in the second complaint form the basis of the indictment counts relating to the second child. According to the district court:

> [A] forensic expert recovered approximately twenty-two
> images of a young girl (who will be referred to as "Jane

3

Doe # 2"), approximately age six, that previously were deleted from the SD card of a camera. According to the second complaint, among the recovered images were nude photographs of Jane Doe # 2 (summarized in the complaint), including a photograph of her genital area, which appeared to be red. Special Agent Troyd stated, "Based upon my discussions with law enforcement personnel familiar with sexual abuse investigations who have examined these images, this is consistent with the sexual abuse of Jane Doe # 2." The complaint also noted that "[i]nvestigators present at the search of the residence of defendant JOSEPH VALERIO who viewed the child pornography images of Jane Doe # 2 recognized the basement and couch from VALERIO's Smithtown residence and recognized Jane Doe # 2 in the images."

*Id.* (second alteration in original). "The photographs are alleged to have been taken in defendant's basement between September 2010 and January 2011." *Id.* at *3.

At Valerio's appearance on the second complaint, a third magistrate judge "detained [him] on grounds of danger to the community and risk of flight." *Id.* Valerio later made three bail applications before the district judge, each to no avail. At the first post-indictment application, Valerio proposed:

(1) a $3 million dollar secured bond subject to a home confinement; (2) GPS electronic monitoring; (3) an outdoor video surveillance system to be accessed at will by the FBI; (4) government approval for any persons entering the house; (5) one private security officer posted outside; (6) searches of all persons entering or exiting the home; (7) unannounced searches of the house and all persons therein; and (8) a prohibition on the possession of cell phones, computers, and the like.

*Id.* In denying Valerio's application, "the [district judge] found that the

4

government had met its burden of demonstrating, by clear and convincing evidence on the issue of dangerousness, and by a preponderance of the evidence on the issue of risk of flight, that no condition or combination of conditions (including those proposed by the defendant) could reasonably assure the safety of the community or defendant's appearance in court." *Id.*

At the second post-indictment bail application, Valerio "supplement[ed his first application] by proposing two security officers (rather than just one officer) posted 24/7, with one stationed inside the house and the other either inside the house or outside in a car. . . . [T]he [district judge] denied the renewed bail motion and adhered to its previous ruling." *Id.*

At the third post-indictment bail application, the one whose denial gave rise to this appeal, Valerio proposed doubling the number of security officers to four, with two stationed inside the house and two stationed outside the house, and to leave to the government's discretion whether the officers should be armed or unarmed. (J.A. 16-17, 19.) In "denying the renewed bail application," the district judge did not "rehash [its] previous recitation of the factors and the reasons for the decision" but instead "focus[ed] . . . on the differences between [the third bail] package and the [second] bail package." (J.A. 25.) The district judge concluded:

> [T]here are other situations where defendants have proposed creating a jail in their homes. . . . [T]hose kind of conditions may be sufficient under certain circumstances. I find that they are insufficient here.

5

My ruling . . . was not just that the conditions to be proposed were insufficient to address the issue of danger or risk of flight. If I had thought they were, I would have said if he had a guard or two, I would have been satisfied.

My conclusion was that this defendant, given the nature of the charges here, the overwhelming evidence that the government has proffered, and the manner in which this crime is alleged to have been committed with respect to the sexual exploitations of a child through electronic meetings, that I concluded that the only way to reasonably be assured of the safety of the community -- obviously flight is an issue as well -- but focusing on the danger to the community for the moment, was for him to be in jailed conditions.

What defense counsel has sought to do here is to create a jail . . . in the mother's home . . . . But I just reiterate what I said previously on that issue, first, I believe this is an imperfect replication of the jail conditions. Although . . . the guards do add a significant component, it is still not as good as a jail is, contingent to some extent on the competency and quality [of] the guards. It is contingent on the nature of the defendant's relationship with everyone who enters the home. While certainly you have those risks in jail, . . . they are not the same in terms of how substantial the risks are. Those risks are much higher when you introduce the variables of someone being in a home where there is a security firm of four guards monitoring it, and you have people, however narrowly you define the people[,] who are permitted to come in and out of the home.

(J.A. 25-26.)

Judge Bianco did not retreat from his earlier findings "that the government has not specifically objected to [the security agency] itself, but to the use of private

6

guards in general," 2014 WL1285890, at *11 n.7, "that defendant has ties to the community, including a close relationship with his mother and sister, and [that] there is no evidence that defendant violated any conditions during his initial release," *id.* at *7.

## ARGUMENT

**THE DISTRICT COURT COMMITTED CLEAR ERROR IN CONCLUDING THAT VALERIO'S $3 MILLION, SECURITY OFFICER ENFORCED HOME DETENTION WAS INSUFFICIENT TO *REASONABLY ASSURE* THAT HE WOULD NEITHER FLEE NOR POSE A DANGER TO THE COMMUNITY.**

### Standard of Review

This Court "review[s] a district court's detention order deferentially and will not reverse unless [the district court's] findings regarding a defendant's risk of flight [and dangerousness] are clearly erroneous." *United States v. Baig*, 536 F. App'x 91, 92 (2d Cir. 2013) (citing *United States v. Sabhnani*, 493 F.3d 63, 75 (2007)). " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). In sum, this Court " 'will disturb the district court's finding only if on the entire evidence [it is] left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1933)) (alteration added).

**The Statute**

Pretrial detention may be appropriate when a defendant is charged with "any felony . . . that involves a minor victim." 18 U.S.C. § 3142(f)(1)(E). Nevertheless, detention is proper only if there is no "condition," or there are no "combination of conditions," that "will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community." *Id.* § 3142(f). It is not the defendant who bears the burden. The government bears the "burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community[] and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted).

There is a presumption that Valerio is a danger and a flight risk. *See* 18 U.S.C. § 3142(e)(3)(E). By definition, a presumption is not dispositive and can be rebutted. This Court has stated:

> In a presumption case . . . , a defendant bears a limited burden of production -- not a burden of persuasion -- to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight. Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered.

*United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Even in a presumption case," this Court has held, "the government retains the ultimate

burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community" and "by . . . a preponderance of the evidence that the defendant presents a risk of flight." *Id.*

To determine whether Valerio had rebutted "the presumptions of dangerous and flight," Section 3142(g) required the district judge to consider:

> (1) the nature and circumstances of the crime charged, including whether the offense is a crime of violence . . . or involves a minor victim;
>
> (2) the weight of the evidence against the [defendant];
>
> (3) the history and characteristics of the [defendant] . . . ; and
>
> (4) the nature and seriousness of the danger to the any person or the community that would be posed by the [defendant]'s release.

18 U.S.C. § 3142(g).

## Where the District Judge Went Wrong

The district judge was "mindful that 'it is only a limited group of offenders who should be denied bail pending trial.' " *Valerio*, 2014 WL 1285890, at *4 (quoting *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)). The district also should have been mindful, but was not mindful, that the Bail Reform Act, "by its nature, is always looking forward." *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009). What the government did not show, and what the district court did not articulate, was "a serious risk" of flight and dangerousness

9

"going forward." *Id.  See also* 18 U.S.C. 3142(f) (employing future tense, simple form of "assure" in "*will* reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community" (emphasis added). Indeed, the only time that the district judge looked forward was when he speculated the following:

> It is certainly possible that defendant could attempt to either overpower, or evade, one or both of the unarmed guards stationed inside or outside his house. Similarly, upon fleeing, an electronic bracelet could easily be cut off, thus preventing the government from locating defendant, and giving him a substantial head start in fleeing before the government could react to any notification that the device had been removed.

*Valerio*, 2014 WL 1285890, at *13.

Anything consistent with the laws of physics "is possible."  And it is beside the point that "no release condition[s] c[an] 'guarantee' the community's safety and . . . [the] defendant's appearance."  *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985).  Detention is proper "[o]nly if the government shows by clear and convincing evidence that no release condition or set of conditions will *reasonably assure* the safety of the community and by a preponderance of the evidence that no condition or set of conditions . . . will *reasonably assure* the defendant's appearance."  *Id.* at 891.  " 'Reasonably' is an important adverb."  *United States ex rel. S. Prawer & Company v. Fleet Bank of Maine*, No. 93 Civ. 165, 1996 WL 173121, at *11 (D. Me. Apr. 9, 1996).  Used in the Bail Reform Act to modify

"assure," it means to assure "[i]n a fair and sensible way." "Reasonably," Oxforddictionaries.com.[1] It also directs a court to use an objective standard. *Cf. United States v. Olvera*, No. 89-50487, 1991 WL 184789, at *1 (9th Cir. Sept. 19, 1991) (applying objective standard to decide if police "officer reasonably believe[d] that he ha[d] consent to enter" room).

With respect to Valerio's proposed bail package, particularly Valerio's proposal for a four security officer enforced home confinement, the district judge "note[d] that there is a debate within the judiciary over whether a defendant, if she is able to perfectly replicate a private jail in her own home at her own cost, has a right to do so under the Bail Reform Act and the United States Constitution." *Valerio*, 2014 WL 1285890, at *8. According to Judge Bianco, "Some courts, while acknowledging the financial discrimination created by such a position, have concluded that the entry of these types of extraordinary bond conditions for those who can afford them is permissible, if not required." *Id.* (citing *United States v. Drier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009). But "[t]he Second Circuit," Judge Bianco observed, "has never decided this precise issue." *Valerio*, 2014 WL 1285890, at *9 (citing *Sabhnani*, 493 F.3d at 78 n.18). Nevertheless, Judge Bianco stated, "the Second Circuit has suggested, in a non-precedential summary order,

---

[1] *See* http://www.oxforddictionaries.com/us/definition/american_english/reasonably (last visited Oct. 2, 2014).

that it is " 'troubled by [the] possibility' of wealthy defendants being able to construct their own private jail, noting that 'such conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy.' " *Id.* (quoting *United States v. Banki*, 369 F. App'x 152, 154 (2d Cir. 2010)) (alteration in original). Judge Bianco added:

> This Court is troubled by that possibility as well. There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location. The Bail Reform Act address conditions of *release,* not conditions of *detention.*

*Id.*

Drifting from a "possibility" to the comically absurd, Judge Bianco quoted at length from a magistrate judge's decision from the Western District of Texas. According to Judge Bianco, the Texas magistrate judge, "in denying a defendant's proposal that he be released on home detention with armed guards in an extended stay-type hotel or apartment," explained:

> From the standpoint of ensuring the person's appearance, what is the difference between [the defendant's] release proposal and detention. [The defendant's] answer to this question is that because it is possible to create a "virtual jail" through a "combination of conditions," the Bail Reform Act mandates that his proposal be implemented in lieu of detention. This argument suggests that so long as a person possesses sufficient resources to propose a virtual jail, there would never be a situation in which detention is permitted. Indeed, I imagine that even

12

> *Hannibal Lecter* could propose adequate release arrangements to secure his appearance and the public's safety if he had the financial resources to do so. While it seems to me that neither the Constitution nor the Bail Reform Act demands such a result, courts are not in agreement on this point.

*Id.* (quoting *United States v. Colorado-Cebado*, No. A-13-CR-458, 2013 WL 5852621, at 5 (W.D. Tex. Oct. 30, 2013)) (alteration in original, emphasis added).

Perhaps the Texas magistrate judge was a Hannibal Lecter fan. Perhaps he enjoyed the original Texas Chain Saw Massacre, whose "primary filming location was an early 1900s farmhouse located . . . near Round Rock, Texas, which is just outside the state's capital, Austin, and is part of the Western District of Texas, where the magistrate judge sits. The Texas Chain Saw Massacre, Wikipedia, http://en.wikipedia.org/wiki/The_Texas_Chain_Saw_Massacre (last visited Oct. 2, 2014). Perhaps he has studied the Karankawas, a people who once "inhabited the Gulf Coast of Texas and, "[a]ccording to some sources, . . . practiced ritual cannibalism of blood enemies . . with other coastal tribes of Texas and Louisiana." Karankawa People, Wikipedia, http://en.wikipedia.org/wiki/Karankawa_people (last visited Oct. 2, 2014). It does not matter. Nor does it matter what Valerio "perhaps could do" or "possibly could do." And "the debate within the judiciary" about private jails is a misguided one. Notwithstanding that debate and this Court's dicta in the precedent-lacking *Banki*, if Valerio's home-security bail package "will reasonably assure the appearance of [the defendant] as required and the safety of

13

any other person and the community," he *must* be released.

It is important to note that this is not a case involving an organized-crime leader who, by possessing the ability to direct the activities of underlings, poses a danger even when under house arrest. *See, e.g.*, *United States v. Ciccone*, 312 F.3d 535, 543 (2d Cir. 2011) (citing cases). In such instances, "post[ing] a bond tends merely to assure that [such a defendant] will not flee and does not relate to protection of the community." *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985). Thus, this is not a situation in which a bail package that might "reasonably assure the appearance of [the defendant] at trial[] will not reasonably assure the safety of the community." *Mercedes*, 254 F.3d at 436-37.

Similarly charged defendants in other districts have been released on bail. *See, e.g.*, *United States v. Thomas*, No. 03-CR-150, 2006 WL 140558, at *1, 24 (D. Md. Jan.13, 2006) (granting bail to defendant charged "with sexual exploitation of a child and the receipt and possession of child pornography"). Indeed, there was a sexual-exploitation case in which a defendant who was charged in one district was released and permitted to self-surrender in a far-off district. *See United States v. Emmons*, 294 F. App'x 848, 849 (5th Cir. 2008) (per curiam) (observing that in Emmons' removal from Connecticut to "Louisiana on two counts of attempted production of child pornography, one count of using a facility in interstate commerce to attempt to coerce a minor to engage in criminal sexual acts, and one

14

count of attempting to distribute child pornography to a minor," "the Connecticut district court ordered Emmons' release on a $500,000 bond, subject to numerous conditions, some of which restricted his ability to travel or access a computer").

The charges against Valerio are serious. But they are comparable to the allegations involved in a Maryland case in which the court granted bail to a defendant charged "with sexual exploitation of a child and the receipt and possession of child pornography." *United States v. Thomas*, No. 03-CR-150, 2006 WL 140558, at *1, 24. In *Thomas*:

> [The magistrate judge] imposed the following [special] conditions . . . , in addition to certain standard conditions, requiring the defendant to: (1) reside at the Connecticut home of his mother and step-father; (2) avoid all contact with the child in the video; (3) report to and obey the supervising officer as directed; (4) refrain from possessing a firearm, destructive device, or other dangerous weapon; (5) refrain from excessive use of alcohol and from any use of narcotics or controlled substances; (6) undergo appropriate medical, psychological, or psychiatric treatment; (7) submit to an electronic monitoring program, with the additional condition that he may not leave the residence to which he is restricted except for pre-approved attorney visits, court appearances, and medical and mental health treatment, during which he must be accompanied by one of his two third-party custodians; (8) have no direct contact with female children; (9) have no use of, or access to, a computer or any other device with internet access.

2006 WL 140558 at *1 n.1. "The government appealed the ruling to the presiding district court judge, who upheld the release decision, but imposed two additional

15

conditions": "prohibit[ing the] defendant from having any unsupervised contact with any persons under the age of eighteen" and "requir[ing] that departures from the residence for the stated purposes be approved in advance by pretrial services." *Id.* at *1 and n.2.

Before Judge Bianco, Valerio consented to all of the restrictions that the magistrate judge and the district judge had imposed in *Thomas*. He also consented, as part of his $3 million, real property secured bail application, (1) to live with his mother and to be under house arrest at his mother's Massapequa home; (2) to have four private security officers enforce that house arrest, (3) to be under the supervision of pre-approved adult family members who would be with him seven days a week, 24 hours a day; (4) to wear an ankle bracelet with built-in GPS monitoring; (5) to use the previously installed outdoor security cameras to monitor who, with the Court's permission, would be permitted to enter the home; (6) to permit pretrial-services officers *and* FBI special agents to search the home prior to his release and to thereafter enter and search the home unannounced and to enjoy free access to the security system's hard drive; (7) that neither computers, cell phones nor any other similar devices would be permitted in the home. (J.A. 14-16, 20, 47-50, 52-53.)

"Given the paucity of reported decisions in this area," *Thomas*, 2006 WL 140558, at *1, it is worth considering other violent, presumption cases in which

16

judges released defendants notwithstanding the allegations' seriousness. *See, e.g.*, *United States v. Lyles*, 195 F. App'x 919, 920 (11th Cir. 2006) (per curiam) (noting that district court had released defendant even though defendant had been charged with distributing methamphetamine and possessing firearm in furtherance of drug crime); *United States v. Starnes*, 157 F. App'x 687, 689-91 (5th Cir. 2005) (per curiam) (reviewing defendant's conviction and 145-year sentence and noting that district court had released defendant on $100,000 bond even though defendant had been charged with ten drug-trafficking and firearms' crimes, including a Section 924(c) charge involving a machinegun); *Payne v. United States*, No. 04-CR-87, 2009 WL 536837, at *1 (N.D. Miss. 2009) (Section 2255 petition) (recounting how defendant had pleaded guilty to possessing crack cocaine and firearm in furtherance of drug crime yet had been released on bond); *George v. Warden*, No. 07 Civ. 147, 2008 WL 2954246, at *2 (N.D. W. Va. 2008) (Section 2241 petition) (recounting how defendant had pleaded guilty to possessing marijuana and firearm in furtherance of drug crime yet had been released on bond); *United States v. Jameson*, 771 F. Supp. 341, 341 (D. Kan. 1991) (denying defendant's post-conviction motion for jail-time credit but noting that defendant had been indicted on six bank-robbery counts and one Section 924(c) count yet had been released on bond); *United States v. Nicholson*, No. 91-CR-10027, 1991 WL 268827, at *1-2 (D. Kan. 1991) (releasing on $50,000 bond a defendant charged with conspiracy to

17

distribute heroin and use of firearm during and in relation to a drug-trafficking crime); *United States v. Laduca*, No. 98-CR-399, docket entries 151, 167, 169, 171, 181, 210, 360, 703-04, 724, 813 and 1006 (E.D.N.Y. Apr. 14, 1998, through Dec. 19, 2000) (defendant Laduca released on $750,000 bond over the government's objection notwithstanding that he had been charged with two Section 924(c) violations and faced a statutory minimum of 25 years' imprisonment).

One other case is worth discussing, even though the inquiry there was limited to a risk of flight. *See United States v. Dreier*, 596 F. Supp. 2d at 832. The government had charged the defendant Dreier with a $400 million fraud, but a judge nevertheless released Dreier on conditions that are comparable to the conditions that Valerio is proposing. The court in *Dreier* stated the following:

> [C]itizen Marc Dreier, whom the Government accuses of colossal criminality, calls upon the Court to fulfill the pledge of the Eighth Amendment to the Constitution that "Excessive bail shall not be required." . . . The Government . . . argues that no conditions of bail can reasonably assure against what it considers to be a high risk of flight, and accordingly urges that bail be denied altogether. . . .[T]his Court . . . concludes that such risk of flight as exists can be so minimized by the imposition of conditions that Dreier may likely meet as to warrant his release.
>
> . . . .
>
> . . . Whatever facts may ultimately emerge, the Government has carried its burden for the limited purposes of the bail hearing of showing that Dreier is not only a master of deceit and a doyen of dishonesty but the

18

kind of person who, under stress, may resort to desperate measures. Indeed, for the limited purposes of the bail hearing, the defense does not challenge the allegations of the indictment that set forth in some detail Dreier's sophisticated frauds and his procurement of impersonation by his confederates. It appears, moreover, that Dreier has not limited the assumption of false identity—a *sine qua non* to any successful flight from justice—to his associates. With his allegedly fraudulent schemes in disarray, Dreier himself, in an effort to obtain badly-needed funds, undertook to pose as a person he had met but minutes earlier—an act of brazen impersonation that his own counsel twice conceded was a "desperate act."

Nor, it would seem, has Dreier been wholly candid with his counsel or the Court. Before Judge Eaton he "emphatically denie[d]," through his counsel, a trip to Turkey that the Government sought to characterize as evidence of his ties abroad[,] and it was only when, unexpectedly, the Government, which did not have Dreier's passport for the relevant period, developed alternative evidence of the travel, that Dreier, all too lamely, asserted through his counsel that he had simply forgotten the trip.

Furthermore, Dreier's motive to flee is palpable, for he faces potentially large sentences if convicted, his money and assets are either frozen or spent, his family ties appear strained, and he has become a pariah to the profession in which he once practiced, as well as to much of the community at large. Without multiplying examples further (but after careful consideration of all the evidence presented to the Court), the Court finds that the Government has more than satisfied its burden of proving by a preponderance of the evidence that Dreier, if released without conditions, would pose a genuine risk of flight.

*Id.* at 832-33 (citations omitted). Notwithstanding the foregoing, the district judge

released the "master of deceit and . . . doyen of dishonesty."  The court found:

> [T]he bail package that Dreier . . . proposes goes far to minimize this risk.  Specifically, he has proposed the following conditions: (1) a $10 million personal recognizance bond that, while not secured by cash, will be co-signed by defendant's son, Spencer Dreier, and his mother, Mildred Dreier; (2) home detention, 24/7, in his East Side apartment, secured not only by electronic monitoring but by on-premises armed security guards, supplied by a company acceptable to the Government but paid for by the defendant's relatives; (3) elimination of computer access, surrender of all travel documents, and screening and searching of pre-approved visitors; (4) strict supervision by Pre–Trial Services; and (5) ongoing cooperation with the court-appointed Receiver in identifying and preserving all assets held directly or indirectly by defendant.
>
> Of these, the most potentially efficacious, and controversial, is Dreier's proposal to have armed guards staying at his apartment at all times, authorized to prevent his leaving his apartment . . . . It cannot be gainsaid that many kinds of bail conditions favor the rich, and, conversely, that there are many defendants who are too poor to afford even the most modest of bail bonds or financial conditions of release.  This is a serious flaw in our system.  But it is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight.

*Id.* at 833.  The court noted that "a provision of the Bail Reform Act . . . contemplates that a defendant may be released into 'the custody of a designated person[ ] who agrees to assume supervision . . . if the designated person is able reasonably to assure the judicial officer that the person will appear as required.'"  *Id.* at 834 (quoting 18 U.S.C. § 3142(c)(1)(B)(I)).

The judge in *Dreier* was mindful of "[t]he real difference between detention in a jail and in a guarded apartment," namely, "that a jail has bars and numerous other physical impediments to flight (and to communication with those who might assist a flight), whereas an apartment lacks such safeguards." *Id.* "But," the judge added, "when one remembers that Dreier, on his own consent, will be confined to his apartment at all times, that any visitors, including his counsel, will have to be pre-approved, and that the guards will be authorized to use all reasonable force to prevent his escape, the possibility of his flight is substantially reduced." *Id.* Valerio, "on his own consent," agreed to the same conditions. Valerio also agreed to the additional conditions that the *Dreier* court had imposed, including:

> [T]hat the defendant expressly consent in writing to the use, by the armed[2] security guards, of "temporary preventive detention and the use of reasonable force" to thwart any attempt to flee; [] that the costs of supplying the armed security guards for three months [] be paid in advance into an escrow account maintained by the United States Attorney's office; [] that, contemporaneous with the defendant's return to his apartment, Government officers, with defendant's consent and assistance, remove from the premises any and all computers, cellphones, modems, and any other means by which the defendant may communicate electronically except by land-line telephone, as well as anything that might serve as a weapon (e.g., knives); [] that the defendant maintain at his residence throughout the period of pretrial release a land-line telephone that has no call forwarding, modem, caller ID, call waiting, or portable cordless telephone

---

[2]     As stated earlier, Valerio left to the government the decision whether to permit the private security officers to carry firearms.

21

> connection; [] that in connection with the electronic monitoring defendant has proposed, defendant wear such electronic monitoring device, and follow such electronic monitoring procedures, as specified by the Pre–Trial Services officer and that the defendant pay the cost of the electronic monitoring, and [] that no visitors be permitted to visit the defendant without the express prior written permission of the Pre–Trial Services officer, given only after consultation with the U.S. Attorney's Office.

*Id.* at 834 (citation omitted).

Valerio concedes that Judge Bianco did not commit "clear error" when, with respect to the first three Section 3142(g) factors, he found that "[t]he superseding indictment contains extremely serious charges," that "the weight of the evidence against the defendant [i]s extremely strong" and that "Valerio's history and characteristics" favor detention. *Valerio*, 2014 WL 1285890, at *5-7. But clear error occurred with the fourth and final Section 3142(g) factor, "the nature and seriousness of the danger to the any person or the community that would be posed by the [defendant]'s release." 18 U.S.C. § 3142(g)(4).

Judge Bianco conceded that, "with respect to the victims identified in the criminal complaints, the first is in Ukraine and thus beyond defendant's physical reach, and there is no evidence that defendant has had contact with the second victim since the images and videos were taken." *Valerio*, 2014 WL 1285890, at *7. But Judge Bianco then speculated that "there is still a clear and compelling danger to the community posed by defendant's release that cannot be addressed by

any combination of bail conditions." *Id.* Although Judge Bianco stated that he was "not decid[ing the private jail] issue . . . because," in his view, "the defendant's proposal f[ell] far short of replicating a private jail in his home that is as secure as a jail facility, *id.* at *9, his reasoning was unsound. Judge Bianco was concerned that someone could sneak an electronic device into the house because " 'it is difficult to conceive of measures that could confidently assure that defendant would not communicate with others and encourage the distribution of child pornography and related illicit activities.' " *Id.* at *10 (quoting *United States v. Schenberger*, 498 F. Supp. 2d 738, 745 (D.N.J. 2007). But the defendant in *Schenberger* was a police officer with computer expertise, and it was the "defendant's computer expertise and police background" that failed to persuade the court "that meaningful assurances c[ould] be given that defendant's access to the internet c[ould] be stopped." *Id.* Moreover, the *Schenberger* defendant's bail package consisted primarily of his "agree[ing] to reside with his father." *Id.* at 741. The proposed bond was unsecured, there were to be no security officers. *Id.*

Judge Bianco was engaging in guesswork when he wrote that "[i]t is certainly possible that defendant could attempt to either overpower, or evade, one or both of the unarmed guards stationed inside or outside his house" and that "upon fleeing, an electronic bracelet could easily be cut off . . . , thus . . . giving [Valerio] substantial head start in fleeing before the government could react to any

23

notification that the device had been removed." *Valerio*, 2014 WL 1285890, at *13. Of course such things "are possible." The Bail Reform Act calls not for eliminating "possibilities," but for "reasonable assurances."

## CONCLUSION

Other than the statutory presumption, the government has little to support an argument that Valerio, *looking forward*, will be a risk of flight or a danger to the community. And the restrictive bail conditions that Valerio proposes, including the four security guards and the video-surveillance system, are more than sufficient to rebut the presumption. Once Valerio is in his mother's house, he cannot get out or reach out, and no one else can get in or reach in, without pretrial service's knowledge or without the government's knowledge. The government did not meet its burden of persuasion that Valerio is a *current* risk of flight or that he is a *current* danger to the community. The district court committed clear error when it concluded otherwise.

Dated:      Hauppauge, New York
                 October 7, 2014

                                             Respectfully submitted,

                                             ___/s/_____
                                             Leonard Lato
                                             35 Arkay Drive, Suite 200
                                             Hauppauge, NY 11788-3756
                                             Telephone No.: (631) 655-5008
                                             Attorney for Defendant-Appellant

24