To Be Argued By:
AMEET B. KABRAWALA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 14-3376

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

JOESPH VALERIO,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR BAIL PENDING TRIAL

LORETTA E. LYNCH,
<u>United States Attorney</u>,
<u>Eastern District of New York</u>.

AMY BUSA,
AMEET B. KABRAWALA,
<u>Assistant United States Attorneys</u>,
    (<u>Of Counsel</u>).

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................ii

PRELIMINARY STATEMENT...........................................1

STATEMENT OF FACTS..............................................1

    I.   The Charges Against Valerio.........................2

    II.  Evidence of Valerio's Danger to the
        Community and Risk of Flight and History
        of Valerio's Bail Applications.....................3

    III. The District Court's Ruling......................10

ARGUMENT - VALERIO WAS PROPERLY DETAINED......................12

CONCLUSION....................................................20

TABLE OF AUTHORITIES

Page

CASES

Easley v. Cromartie,
  532 U.S. 234 (2001) ........................................ 13

United States v. Banki,
  369 Fed. Appx. 152 (2d Cir. 2010)(summary order) ............ 19

United States v. Barnett, 03-cr-243,
  2003 WL 22143710 (N.D.N.Y. Sept. 17, 2003) .................. 15

United States v Carswell,
  144 F. Supp. 2d 123 (N.D.N.Y. 2001) ......................... 16

United States v. Colorado-Cebado, No. 13-CR-458,
  2013 WL 5852621 (W.D. Tex. Oct. 30, 2013) ................ 18-19

United States v. Craft,
  763 F.2d 402 (11th Cir. 1985) ............................... 19

United States v. Falcon, No. 06-60080-01,
  2007 U.S. Dist. LEXIS 44358 (W.D. La. June 18, 2007) ........ 18

United States v. Ferranti,
  66 F.3d 540 (2d Cir. 1995) .................................. 13

United States v. Gotti,
  794 F.2d 773 (2d Cir. 1986) ................................. 16

United States v. MacEwan,
  445 F.3d 237 (3d Cir. 2006) ................................. 14

United States v. Madoff,
  586 F. Supp. 2d 240 (S.D.N.Y. 2009) ......................... 15

United States v. Martir,
  782 F.2d 1141 (2d Cir. 1986) ................................ 16

United States v. Reiner,
  468 F. Supp. 2d 393 (E.D.N.Y. 2006) ......................... 17

United States v. Rodriguez,
  950 F.2d 85 (2d Cir. 1991) .................................. 16

United States v Savader,
  944 F. Supp. 2d 209 (E.D.N.Y. 2013) .......................... 16

United States v. Schenberger,
  498 F. Supp. 2d 738 (D.N.J. 2007) ........................... 14

United States v. Shakur,
  817 F.2d 189 (2d Cir. 1987) ................................ 16

United States v. Valerio,
  - F. Supp. 2d -, 2014 WL 1285890 (E.D.N.Y. Apr. 1, 2014) .... 16

STATUTES

18 U.S.C. § 2251..................................... 1, 2, 3, 14

18 U.S.C. § 2252(a)...................................... 2, 3

18 U.S.C. §§ 3141 et seq..................................... 13

18 U.S.C. § 3142........................................... 14

1

PRELIMINARY STATEMENT

Joseph Valerio appeals from an order entered September 8, 2014 in the United States District Court for the Eastern District of New York (Bianco, J.), detaining him pending trial. Valerio is charged with the sexual exploitation of two female minors, pursuant to 18 U.S.C. § 2251(a), and related child pornography offenses. Valerio has been in custody pursuant to an order of detention issued by the district court on February 28, 2014. On appeal, Valerio claims that the district court erred in finding that Valerio's third proposed bail package was insufficient to reasonably assure that Valerio would not pose a danger to the community and would return to court.

Valerio's arguments are without merit. The district court found, independent of the presumption of detention applicable in this case, that no condition or combination of conditions would reasonably assure the safety of the community or reasonably assure Valerio's appearance in court. Because the district court carefully evaluated the proffered evidence of Valerio's dangerousness and risk of flight and correctly applied the law, the order detaining Valerio should be affirmed.

STATEMENT OF FACTS

The charged offenses arise from Valerio's production of child pornography involving a then three-year-old female

victim in Ukraine (who is referred to herein as "Jane Doe # 1")
between approximately April 1, 2012 and November 1, 2012, and a
then six-year-old female victim (who is referred to herein "Jane
Doe # 2") at Valerio's Smithtown, New York residence between
approximately September 10, 2010 and January 19, 2011. See
United States v. Valerio, ___ F. Supp. 2d ___, 2014 WL 1285890,
at *1 (E.D.N.Y. Apr. 1, 2014).

I.   The Charges Against Valerio

          On February 26, 2014, following Valerio's arrest on a
complaint described below, a grand jury empanelled in the
Eastern District of New York returned an indictment, charging
Valerio with two counts of sexual exploitation of a child and
other charges. Valerio, 2014 WL 1285890, at *3. The indictment
was superseded twice. Id. at * 3. (JA 8 dkt. ent. 37).[1] The
second superseding indictment, which was the operative
indictment at the time of the detention order from which Valerio
appeals, charged him with conspiracy to exploit a child (Count
One), in violation of 18 U.S.C. §§ 2251(a) and 2251(e); three
counts of sexually exploiting a child (Counts Two, Three and
Fifteen), in violation of 18 U.S.C. §§ 2251(a), 2251(c) and
2251(e); nine counts of attempted sexual exploitation of a child
(Counts Six through Fourteen), in violation of 18 U.S.C.

---

[1]     "Mot.," "JA" and "Exh." refer to Valerio's motion, the
joint appendix and the government's exhibit attached to this
memorandum.

§§ 2251(a) and 2251(e); one count of transporting child pornography (Count Four), in violation of 18 U.S.C. § 2252(a)(1); one count of receiving child pornography (Count Five), in violation of 18 U.S.C. § 2252(a)(1); and one count of possessing child pornography (Count Sixteen), in violation of 18 U.S.C. § 2252(a)(4)(B). (JA 64-82).

Each offense involving the sexual exploitation of a child carries a mandatory minimum of no less than 15 years' imprisonment. See Valerio, 2014 WL 1285890, at *1 (citing 18 U.S.C. § 2251(e)). Valerio's estimated Sentencing Guidelines range, as noted by his counsel, is at least 292 to 365 months' imprisonment; the government estimated the Guidelines range to be 360 months' to life imprisonment. Id. at *1, n.1.

II. Evidence of Valerio's Danger to the Community and Risk of Flight and History of Valerio's Bail Applications

Following the execution of a search warrant at Valerio's Smithtown residence on January 28, 2014, Valerio was arrested and a criminal complaint was filed against him, sworn to by a special agent of the Federal Bureau of Investigation ("FBI"). The January 28, 2014 complaint charged Valerio with sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a). Valerio, 2014 WL 1285890, at *1. According to this complaint, beginning on or about April 2012, Valerio aided and abetted the production of child pornography by a woman in

Ukraine.  Id.  Specifically, the complaint charged that the woman, at Valerio's request and instruction, filmed herself performing various sexually-explicit acts scripted by Valerio with her three-year-old daughter, Jane Doe # 1, and sent those videos to Valerio through her mobile phone and parcel delivery service.  Id.  According to the complaint, Valerio and the woman also exchanged emails regarding the videos and sexually-explicit acts.  Id.  On January 28, 2014, Valerio was detained by United States Magistrate Judge William D. Wall, with leave to reopen and present a bail package in the future.  Id.

On February 4, 2014, United States Magistrate Judge A. Kathleen Tomlinson conducted a detention hearing and, over the government's objection, authorized Valerio's pretrial release on a secured bond, subject to certain conditions.  Id. at *2. Those conditions included, inter alia, (1) confessions of judgment totaling $3 million and secured by real property owned by Valerio's mother, (2) confinement at his mother's house, (3) installation of government-approved surveillance equipment to permit monitoring of persons entering and exiting the house, and (4) a prohibition on the use of a computer or cell phone. Id.  On February 12, 2014, Valerio was released on bond following the installation of the surveillance equipment at his mother's house.  See id.

As law enforcement agents forensically examined computer equipment recovered during the initial January 28, 2014 search of Valerio's residence, they discovered approximately 22 images of a young girl, Jane Doe # 2, approximately age six, that previously were deleted from the SD card of a digital camera recovered from Valerio's residence. Id. Among the recovered images were nude photographs of Jane Doe # 2, including a photograph of her genital area, which appeared to be red.[2] Id. Investigators present at the initial search of the Valerio's residence who viewed these images recognized the basement and couch from Valerio's residence and recognized Jane Doe # 2. Id.

The discovery of pornographic images of Jane Doe # 2 led to Valerio's re-arrest on February 24, 2014, followed by the filing of a second criminal complaint on February 25, 2014. Upon being informed that he was under arrest for sexual exploitation involving Jane Doe #2, Valerio said in front of FBI agents, "I feel like killing myself" and "I don't have a family any more." Id. at *7. On February 25, 2014, after the second criminal complaint was filed, United States Magistrate Judge Gary R. Brown detained Valerio on grounds of danger to the community and risk of flight. Id. at *3.

---

[2]    This redness is consistent with sexual abuse. Valerio, 2014 WL 1285890, at *2.

Additionally, on February 25, 2014, law enforcement agents executed a second search warrant at Valerio's residence. See id. at *7. During this second search of Valerio's residence, agents discovered that he had cameras hidden in the floor, the ceiling, and a clock on the wall. Valerio, 2014 WL 1285890, at *7. (Exh. 7-8, 34).

On February 26, 2014, the grand jury returned an indictment charging Valerio with two counts of sexual exploitation of a child, one count of transportation of child pornography, and one count of possession of child pornography, in connection with Jane Doe # 1. Valerio, 2014 WL 1285890, at *3. On February 28, 2014, Valerio was arraigned on the indictment and defense counsel requested additional time to present a bail package to the district court. Id. The court ordered Valerio detained without prejudice to a future bail application. Id.

On March 5, 2014, the grand jury returned a superseding indictment that added one count of sexual exploitation of a child in connection with Jane Doe # 2. Id. On March 6, 2014, Valerio was arraigned on the superseding indictment, and he moved for release from custody based upon the following proposed bail package: (1) a $3 million secured bond subject to a home confinement at his mother's house; (2) global positioning system electronic monitoring; (3) an outdoor video

surveillance system to be accessed at will by the FBI; (4) government approval for any persons entering the house; (5) one private security officer posted outside; (6) searches of all persons entering or exiting the home; (7) unannounced searches of the house and all persons therein; and (8) a prohibition on the possession of cell phones, computers, and the like. Id.

At the March 6, 2014 hearing before the district court, the government argued for detention, noting that Valerio had a long history of predatory behavior and had been previously convicted for misdemeanor attempted forcible touching, which arose from Valerio's groping of a woman's genitals at a water park. (Exh. 4-5). The government also proffered evidence as to the strength of its evidence against Valerio, including his confession that he directed the sexual exploitation of Jane Doe # 1. (Exh. 8). The government further asserted that Valerio could easily hide a cell phone in any number of places, allowing him to contact others online and continue his abuse if released pending trial. (Exh. 10).

During the March 6, 2014 hearing, the district court found that the government had met its burden of demonstrating, by clear and convincing evidence on the issue of dangerousness, and by a preponderance of the evidence on the issue of flight risk, that no condition or combination of conditions (including

those proposed by Valerio) could reasonably assure the safety of the community or Valerio's appearance in court.  <u>Valerio</u>, 2014 WL 1285890, at *3.

On March 20, 2014, Valerio renewed his bail application, supplementing it by proposing two security officers (rather than just one officer) posted around the clock, with one stationed inside the house and the other either inside the house or outside in a car.  (JA 6 dkt. ent. 20).  The government opposed Valerio's application and Valerio replied.  (JA 6 dkt. ent. 21, 22).

At a hearing on March 21, 2014, the government argued that Valerio had carried out his crimes against Jane Doe # 1 by email and that Valerio could similarly cause "immeasurable harm" if released on bail.  (JA 23).  The government described (and provided a copy to Valerio and the court) an email that demonstrated the ease with which Valerio caused the sexual exploitation of Jane Doe # 1 in which Valerio scripted out very graphic sex acts to be performed on the child and how he wanted the toddler to be dressed in pantyhose.  (<u>See</u> JA 13, 23-24). The government also argued,

> The online danger here can be established
> with . . . a device as small as you know,
> two inches by three inches which you could
> secrete anywhere in that house.  People
> coming into that house could bring them in.
> The defendant's mother parks in an attached
> garage in that house.  They could come in

> via her car.  There's a myriad of ways that
> a cell phone or an electronic device could
> make its way into that house.

(JA 24).  For the reasons set forth on the record on March 21,
2014, the district court denied the renewed bail motion and
adhered to its previous ruling.  (JA 31-37).[3]

On April 9, 2014, the grand jury returned the second
superseding indictment described above.  (JA 8 dkt. ent.#37).
That day, the district court arraigned Valerio on the second
superseding indictment.  (Id. dkt. ent. 38).  Valerio was
continued in custody.  (Id.)

Valerio made a third post-indictment bail application
at a hearing on August 26, 2014, the denial of which gives rise
to this appeal.  (JA 9 dkt. ent. 58, 63, JA 45-62).  In his bail
application, Valerio proposed posting two additional security
guards, with two positioned inside the house and two stationed
outside; the bail package otherwise remained unchanged.
(JA 52).  The government opposed the application, arguing that
even with additional guards there was no way to prevent a small
electronic device from entering the home.  (JA 54).  The

---

[3] On March 27, 2014, Valerio appealed the district
court's determination to this Court and, on April 1, 2014, the
district court memorialized in a written decision its March 21,
2014 order.  See Valerio, 2014 WL 1285890.  Valerio subsequently
stipulated to withdraw the appeal with prejudice, which was "so
ordered" on July 9, 2014.  See United States v. Valerio, 14-921-
cr, Dkt. # 30 (2d Cir. Jul. 9, 2014).

government also noted that upon conviction at trial, Valerio could be incarcerated for the rest of his life. (JA 54-55).

III. <u>The District Court's Ruling</u>

At the August 26, 2014 hearing, the district court denied Valerio's bail application. In doing so, the district court did not "rehash [its] previous recitation of the factors and reasons for the decision" stated in its April 1, 2014 written decision, <u>Valerio</u>, 2014 WL 1285890, but instead "focused . . . on the differences between [the third post-indictment bail application] and the [second] bail package." (JA 58).[4] The district court noted that it reached a "fact-based conclusion based on the circumstances of this particular case." (JA 62).

Specifically, the district court concluded that the "nature of the crimes charged here, the manner in which it is charged to have been committed, the overwhelming evidence the government has proffered, all lead to the conclusion that the defendant needs to be incarcerated pending a trial, which is about to take place shortly."[5] (<u>Id.</u>). The district court observed that while Valerio "has sought to . . . create a jail as best [he] can in [his] mother's home," his proposed

---

[4]     In its written order, the district court incorporated its reasons at the hearing on August 26, 2014, its April 1, 2014 written order and its oral rulings on March 6, 2014 and March 21, 2014. (JA 83).

[5]     Jury selection is now scheduled for October 20, 2014, and trial is scheduled to commence on November 3, 2014.

"replication of the jail conditions" was "imperfect[,]" because, among other reasons, the presence of private security guards is "contingent to some extent on the competency and quality [of] the guards" and "the nature of the defendant's relationship with everyone who enters the home." (JA 59). The district court further observed that the risks of the private security arrangement were substantially greater than those presented by incarceration. (JA 59-60).

Although the district court's August 26, 2014 ruling focused on Valerio's dangerousness to the community, it had previously concluded that Valerio posed a flight risk. See Valerio, 2014 WL 1285890, at *13. While noting Valerio's age and health problems, the district court concluded,

> Given the extremely strong evidence against him and the substantial penalties that he faces, the Court does not believe any condition or combination of conditions will reasonably assure his appearance in court. It is unclear what moral suasion his family, or the bail package they propose, will have over defendant under these circumstances.

Id. Further, the district court found that, because home detention with guards "is an imperfect attempt to address the issue of dangerousness, it also does not adequately address the issues of flight." Id. The district court observed that Valerio could "attempt to either overpower, or evade, one or both of the unarmed guards stationed inside or outside his

house" and "upon fleeing, an electronic bracelet could easily be cut off, thus preventing the government from locating defendant, . . . giving him a substantial head start in fleeing before the government could react to any notification that the device had been removed." Id.

The court explained that it was not finding a categorical prohibition against bail for those charged with "using electronic means to engage in possession of child pornography, or the more significant charge of distributing or sexual exploitation," but that it had concluded that based on its individualized assessment of the facts here, the proposed bail package was insufficient to assure the safety of the community or Valerio's appearance in court. (JA 59-62).

ARGUMENT

VALERIO WAS PROPERLY DETAINED

The district court properly detained Valerio pending trial, correctly finding that Valerio presented a danger to the community and a flight risk, and that no condition or combination of conditions could reasonably assure the safety of the community or Valerio's return to court. The district court correctly considered the severity of the charges, the strength of the government's case, the electronic means through which Valerio instructed Jane Doe # 1's mother to produce child pornography scripted by and transmitted to Valerio, who was

thousands of miles away while the exploitation was ongoing, and Valerio's history and characteristics, including the alleged use of his home to commit one of the crimes and the use of hidden electronic equipment in his residence to sexually exploit Jane Doe # 2. See Valerio, 2014 WL 1285890, at *12.

This Court reviews for "clear error" the historical facts upon which a district court relies in determining whether a defendant poses a danger to the community or a flight risk. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). Under that standard, an appellate court should not reverse simply because it would have decided the case differently; rather, the reviewing court must ask whether, on the entire record, it is left with a definite and firm conviction that a mistake has been committed. See Easley v. Cromartie, 532 U.S. 234, 242 (2001) (citation omitted). The appellate court's "scope of review is slightly broader with respect to the 'ultimate determination' that a defendant does, or does not, present a risk to the citizenry." Ferranti, 66 F.3d at 542 (citations omitted).

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts must order a defendant's pretrial detention upon determining that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C.

§ 3142(e)(1).  Moreover, because Valerio was charged with offenses involving a minor victim under 18 U.S.C. §§ 2251 and 2252(a)(1), there is a statutory presumption of detention.  See 18 U.S.C. § 3142(e)(3)(B).  "The reason for this presumption is clear:  'No one questions that child pornography is an insidious offense since it takes advantage of a particularly vulnerable segment of society, children.'  United States v. Schenberger, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (citing United States v. MacEwan, 445 F.3d 237, 250 (3d Cir. 2006))."  Valerio, at *5.

The Bail Reform Act lists four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the weight of the evidence of the defendant's guilt, (3) the history and characteristics of the defendant, and (4) the seriousness of the danger posed by the defendant's release.  18 U.S.C. § 3142(g).

While Valerio acknowledges that the district court did not commit "clear error" with respect to three factors under Section 3142(g), he argues that "clear error occurred with the fourth factor, 'the nature and seriousness of the danger to the any [sic] person or the community that would be posed by the [defendant]'s release.'"  (Mot. 8) (quoting 18 U.S.C. § 3142(g)(4)).  Valerio contends that the district court "should have been mindful that the Bail Reform Act, 'by its nature, is always looking forward.'"  (Id. at 7) (quoting United States v.

Madoff, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009)). In this regard, Valerio claims that the district court "did not articulate that there was 'a serious risk' of flight and dangerousness *looking forward*." (Mot. 7) (emphasis in original). And Valerio contends that the government did not demonstrate that he poses any "current" danger or flight risk. (Mot. 9). Valerio's arguments in the face of record evidence are unavailing.

As an initial matter, Valerio selectively quotes from Madoff for the proposition that the Bail Reform Act is, "by nature . . . always looking forward." See id. In the very next sentence following this quote, the Madoff court observed that "[t]o be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future. . . ." Madoff, 586 F. Supp. 2d 240 at 250 (emphasis added). Thus, contrary to Valerio's contention, the Madoff court observed that a defendant's past behavior may properly be considered in determining whether he poses a danger to the community or flight risk.

Indeed, numerous courts have concluded that, in determining whether a defendant should be detained, his "past behavior best predicts future behavior . . . ." United States v. Barnett, 03-CR-243, 2003 WL 22143710, at *12 (N.D.N.Y. Sept. 17, 2003); see also United States v. Rodriguez, 950 F.2d 85, 88-

89 (2d Cir. 1991)(prior record of violent acts eases government's burden of showing dangerousness); United States v. Shakur, 817 F.2d 189, 199 (2d Cir. 1987)(past flight related to charges currently pending was relevant to whether defendant presented a future flight risk); United States v. Gotti, 794 F.2d 773, 779 (2d Cir. 1986)(predictions of defendant's future behavior may rest on recent or past behavior)(citing United States v. Martir, 782 F.2d 1141, 1146 (2d Cir. 1986)); United States v. Savader, 944 F. Supp. 2d 209, 214 (E.D.N.Y. 2013) (in detaining a defendant on charges that he stalked, extorted and victimized women through unauthorized access to computer systems, the court concluded that defendant posed a danger to the community because he could access victims' information and "compromising photos . . . from any Internet-enabled device" and "it would be all but impossible to fashion terms and conditions that would eliminate defendant's access to these materials."); United States v. Carswell, 144 F. Supp. 2d 123, 137 (N.D.N.Y. 2001).

Here, in concluding that Valerio's proposed bail package would not reasonably assure the safety of the community or his appearance in court, the district court properly based its detention order on the government's proffered evidence regarding the nature and circumstances of Valerio's charged criminal conduct. In particular, the district court found that

the government established that Valerio caused Jane Doe # 1 to be sexually exploited by a woman in Ukraine in order to send videos of the exploitation to Valerio and that Valerio used hidden electronic equipment at his residence to sexually exploit Jane Doe # 2. Valerio, 2014 WL 1285890, at *7, *12; cf. United States v. Reiner, 468 F. Supp. 2d 393, 397 (E.D.N.Y. 2006).

The district court explained that, "[b]ecause of a person's ability to use his or her home, a computer, and/or a mobile phone to commit this type of alleged violent conduct, the ability to monitor, to detect, and to prevent such conduct from reoccurring on bail is extremely difficult." Valerio, 2014 WL 1285890, at *5. In this regard, the district court observed that electronic devices such as mobile phones, tablets and the like -- the "type of instrumentalities allegedly used to commit the crimes" -- are "ubiquitous and easy to procure or hide, and increasingly even the lowest-level devices have internet functionality." Id. at *10. Thus, the court found "by the click of a computer key or tap of a touchscreen on a mobile phone," Valerio "could cause the same type of extreme harm to children and the community that he is alleged to have committed in the instant case." Id. at *7.

Notwithstanding the government's proffered evidence of Valerio's criminal conduct, Valerio argues that the district court "speculated" that it was "possible" Valerio could hide an

Internet-accessible electronic device in the house or attempt to overpower or evade the private security guards. (Mot. 7) (citing Valerio, 2014 WL 1285890, at *10, *13). Although Valerio acknowledges that "such things are possible[,]" he argues that the Bail Reform Act "calls not for eliminating 'possibilities,' but for 'reasonable assurances.'" (Mot. 8) (internal quotation marks omitted).

Contrary to Valerio's contention, speculation played no part of the district court's thorough and well-reasoned ruling. The court expressly found that neither Valerio's mother nor the private security guards "could ensure (to the same extent as jail) that Valerio would not use such items." Valerio, 2014 WL 1285890, at *10 (parenthetical in original). The court explained that "[u]nlike in a jail, which provides greater layers of security to attempt to ensure that inmates do not possess contraband, the Court can conceive of several avenues through which defendant may procure or retain such devices on the premises, which heightens the risk of danger to the community." Id. Indeed, the district court found that the government proffered evidence demonstrating that Valerio secreted cameras in the floor, ceiling, and a clock on the wall. Id. at *7; see also United States v. Falcon, No. 06-60080-01, 2007 U.S. Dist. LEXIS 44358, at *15-16 (W.D. La. June 18, 2007).

The district court also correctly concluded that, based on a preponderance of the evidence proffered by the government, Valerio posed a flight risk.  In this regard, the district court found that some of the same reasons why home detention with guards was "imperfect" to address Valerio's dangerousness also did not "adequately address the issues of flight."  Valerio, 2014 WL 1285890, at *13 & n.9.[6]

Thus, contrary to Valerio's claim, the district court's detention order was not based on "speculation" but instead on reasoned analysis of the government's proffered evidence.  See United States v. Banki, 369 Fed. Appx. 152, 154 (2d Cir. 2010)(summary order)(rejecting argument that the district court erred by denying bail where defendant proposed that home confinement would be enforced by private security guards financed at his expense and noting that "issues regarding the nature of the security that would be provided by such an arrangement, and the additional costs to the government in supervising such an arrangement . . . persuade us that it is not legal error for a district court to decline to accept such a condition of release as a substitute for detention"); United

---

[6]     Valerio's risk of flight has only increased given the fast-approaching trial date.  Cf. United States v. Craft, 763 F.2d 402, 405 (11th Cir. 1985) (scheduling of a trial date "increases the chance that the defendant will be in custody all the sooner, and so, increases the . . . defendant's motivation to flee").

States v. Colorado-Cebado, No. 13-CR-458, 2013 WL 5852621, at *6 (W.D. Tex. Oct. 30, 2013) ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?").

In short, the district court correctly found that based on Valerio's dangerousness to the community and risk of flight, he should be detained because no combination of conditions can protect the safety of the community or reasonably assure his return to court.

### CONCLUSION

For the foregoing reasons, the district court's order of detention pending trial should be affirmed.

Dated:      Brooklyn, New York
            October 20, 2014

                             Respectfully submitted,

                             LORETTA E. LYNCH,
                             United States Attorney,
                             Eastern District of New York.

                  By:    _____/s/_____
                             AMEET B. KABRAWALA
                             Assistant U.S. Attorney

AMY BUSA,
AMEET B. KABRAWALA,
Assistant United States Attorneys,
     (Of Counsel).

E X H I B I T
(Transcript of Proceeding, March 6, 2014)

1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     ---------------------------X
3
     UNITED STATES OF AMERICA,           CR 14-0094
4

5        -against-
                                         U.S. Courthouse
6                                        Central Islip, NY
     JOSEPH VALERIO,
7                                        March 6, 2014
         Defendant.                      2:30 p.m.
8
     ---------------------------X
9

10              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JOSEPH F. BIANCO
11           UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Government:        LORETTA E. LYNCH
14                              United States Attorney
                                100 Federal Plaza
15                              Central Islip, NY 11722
                                By:  ALLEN BODE, ESQ.
16                                   Assistant U.S. Attorney

17   For the Defendant:         ANTHONY LAPINTA, ESQ.
                                LEONARD LATO, ESQ.
18

19
     Court Reporter:            Owen M. Wicker, R.P.R.
20                              100 Federal Plaza
                                Central Islip, NY 11722
21                                  (631) 712-6102

22

23

     Proceedings recorded by mechanical stenography; transcript
24   produced by computer transcription.

25

Proceedings

2

1    THE COURT:  Why don't we call the case.  United

2    States versus Joseph Valerio, 14-94.

3    MR. BODE:  Allen Bode for the Government, your

4    Honor.

5    MR. LaPINTA:  Appearing for Mr. Valerio, Anthony

6    LaPinta, and also present, cocounsel Leonard Lato.

7    THE COURT:  Good afternoon.  And Mr. Valerio is

8    present as well.

9    MR. BODE:  While we're waiting for the copy to

10   come, I'll hand up to Court two things I will reference

11   and was previously before Magistrate Tomlinson and

12   Magistrate Brown.  One is a description from the PSR of

13   the prior offense, the attempt of forcible touching by

14   Mr. Valerio, and the second is a log of his interactions

15   with the probation report which I'll be referring to.

16   So the Court is aware, the most recent stuff is

17   on page 1 and the oldest stuff is on the last page.

18   THE COURT:  Okay.

19   So I think we'll try to do two things today.  I

20   think the first thing, obviously there has been a

21   superseding indictment, so if your client is prepared to

22   be arraigned on that and then go to the bail issue?

23   MR. LaPINTA:  Yes.

24   THE COURT:  Have you received a copy of the

25   superseding indictment?

Proceedings

3

1        THE DEFENDANT:  Yes.

2        THE COURT:  Have you had time to discuss it with

3   your attorney and discuss it for purposes of arraignment?

4        THE DEFENDANT:  Yes, your Honor.

5        THE COURT:  Do you waive the entire reading of

6   the superseding indictment?

7        THE DEFENDANT:  Yes, your Honor.

8        THE COURT:  How do you plead:  Guilty or not

9   guilty?

10        THE DEFENDANT:  Not guilty.

11        THE COURT:  A not guilty plea has been entered,

12   so we'll proceed to the bail hearing.

13        Because a prior determination of this Court was

14   based on concept without prejudice to renewal, I'm

15   treating this de novo, and therefore the Government has

16   the burden.

17        And if Mr. Bode can outline his position.

18        MR. BODE:  Yes, your Honor.

19        As the Court is aware, this is a crime of

20   violence pursuant to the Bail Reform Act, so there is a

21   presumption here.  In terms of the burden, as the Court

22   is, I'm sure, aware, the Government is alleging the

23   defendant is a danger to the community and a risk of

24   flight.

25        As a danger to the community, I have to show to

Proceedings

4

1    the Court by clear and convincing evidence, and as to

2    flight, by a preponderance.

3            In terms of the factors:  nature and

4    circumstance of the crime charged; the weight and evidence

5    against the defendant; his history and characteristics,

6    including family ties, flight, financial resources,

7    community ties, past conduct; and then the nature and

8    seriousness of the danger to the community if he is

9    released.

10            I'll start with the danger to the community.

11            The Government asserts Mr. Valerio is so

12    dangerous there are no conditions or combination of

13    conditions other than incarceration that can sufficiently

14    protect the public here.  We believe pretrial's

15    recommendation there is no such combination of conditions

16    is correct.  As such, there is no need for the Court to

17    even look at the sufficiency of the package in terms of

18    flight, but I'll address that later as well.

19            Regarding the history and characteristics, I'll

20    start with Mr. Valerio's substantial history which shows

21    his long-standing predatory behavior.

22            One thing to note at the start, I'm not going to

23    rely, your Honor, upon the ex parte rule of protection

24    history that the defense referenced.  Magistrate Brown, in

25    finding the defendant was a danger, didn't rely on that,

Proceedings

5

1    and I will not rely on it at this point either.  So I'll

2    start with his misdemeanor conviction.

3            From the PSR description, your Honor, that

4    conviction, misdemeanor, for attempted forcible touching,

5    he groped a woman's genitals at a water park.

6    Following -- as is set forth in that PSR, following his

7    allocution, Mr. Valerio lied, denied the conduct and later

8    again came around, reinterviewed and admitted his conduct

9    again, which is a pattern of Mr. Valerio in terms of his

10   lying, which, as I'll get to in a moment, would make him

11   not susceptible to pretrial monitoring.

12           Once he was on probation, as you can see in the

13   description, there are numerous times he was caught lying.

14   He was also caught hiding contraband.  It is detailed in

15   the notes.  He hid videos of women that he had filmed

16   surreptitiously undressing in a basement crawl space.  He

17   hid them from Probation.  That is a habit of his as well,

18   hiding things, hiding contraband.

19           He was never prosecuted for that conduct because

20   it was beyond the statute of limitations.

21           The reason why that is particularly

22   interesting -- that was discovered in 2006 -- it was

23   beyond the statute of limitations, which would be five

24   years in New York.  So we're talking about his predatory

25   behavior, being over the course of at least a 13-year

Proceedings

6

1    period, brings us to 2014.  A long-standing personality

2    disorder involving Mr. Valerio, your Honor.

3            As you can see, he had knives, dummy pistols and

4    a rifle hidden in a garage.  He consistently lied to his

5    probation officer monitoring him.  Only because of

6    polygraphing did he finally admit he photographed

7    underaged girls, in their mid-teens, and also admitted

8    sexual contact with a minor babysitter.

9            He continues to lie and manipulate.  Those words

10   are through the entire probation period of monitoring.

11           Ingrained behavior.  Over that 13-year period it

12   has gotten worse.  In fact, his victims have gotten

13   younger.  He cannot be expected to cooperate with pretrial

14   monitoring.

15           Prior to learning about the victim that

16   Mr. Valerio photographed in his basement, Mr. Valerio was

17   released by Magistrate Tomlinson on strict electronic

18   monitoring with sex offender treatment.  He immediately

19   started lying to Dr. DeSantis, the doctor he was seeing

20   for pretrial.  He told her he was only charged with child

21   pornography possession.  He was charged with production.

22           There was a three-year-old that was being

23   molested.  He was involved with respect to the conduct

24   involving Jane Doe number two, where he was leaving the

25   office where he was admonished for lying to her.

Proceedings

7

1       There are two separate victims here.  It's not

2   an isolated incident.  The age of the victims, they are

3   egregious, two and six.  These are not older children.

4   He's taking advantage of the utterly defenseless.

5       As to the three-year-old victim, there are

6   numerous e-mails over the course of time requesting sex

7   acts be done on the three-year-old child and the

8   accompanying videos then coming back to Mr. Valerio via

9   e-mail to his computer.  There were 20 videos, all

10   recovered from his computer here in Smithtown.  All the

11   accompanying e-mails requesting the acts be done to the

12   three-year-old were recovered as well.

13       THE COURT:  Looking at the defense letter -- and

14   they suggested the Government may not be able to prove

15   that the abuse occurred at his direction.

16       You are saying based upon the timing of the

17   e-mails and videos, you would be able to prove it

18   circumstantially.

19       MR. BODE:  Slowly, based on what is on the

20   computer, your Honor, absolutely.

21       THE COURT:  Okay.

22       MR. BODE:  As to the six-year-old victim,

23   Mr. Valerio built a stage in his basement.  He hid a

24   camera in the floor.  He hid a camera in the ceiling.  He

25   hid a camera in the clock on the wall.  Three different

Proceedings

8

1    cameras located in the second search warrant which was

2    issued in this case.

3           This was not a spur-of-the-moment event.  This

4    was well thought out.  Although he had deleted the video

5    from the SD card, so that the stills remained, you could

6    see that they are in sequence; that he dressed this child

7    in fetish outfits, cheerleader outfits, other items which

8    were recovered in the secondary search warrant as well as

9    in addition to recovering the cameras.

10          Regarding the three-year-old victim, I would

11   also note in terms of the strength of the case, initially

12   Mr. Valerio confessed and admitted that conduct, your

13   Honor.  So based on his confession, the videos, the case

14   would be provable solely based on the evidence

15   recoverable.  It's a strong case.

16          Upon learning he was being rearrested for

17   filming the six-year-old, Mr. Valerio said in front of the

18   FBI agents:  I feel like killing myself.  And he

19   indicated:  I don't have a family anymore.

20          The Government would assert as well, any

21   suicidal feelings on the part of Mr. Valerio create a

22   substantial danger to the public.  People who intend to

23   kill themselves have no consequence to their actions.

24   There is nothing to stop him from harming a child.

25          The mandatory minimum here of 15 years for each

Proceedings

9

1  of the production counts amplifies the danger.

2         Mr. Valerio is 47 years old with a history of

3  thyroid cancer.  The statutory minimum is 15 years and a

4  maximum of 30 years in prison for each of the production

5  counts.

6         The Government's statement of Mr. Valerio,

7  guidelines are 360 months to life imprisonment.  There's a

8  high likelihood that Mr. Valerio will be incarcerated for

9  a substantial portion of the rest of his life.  There is

10  no legal ramifications for him to cause harm to the public

11  were he to be released.  He would not be in any worse

12  position legally than he is now.

13         And then I would note particularly in

14  Mr. Valerio's case, the online danger here is great.

15         In this case Mr. Valerio was perpetrating the

16  abuse of the three-year-old through another party, the

17  mother of the child, overseas, online.  His behavior was

18  solely online in that case as to that child.

19         This Court has recognized in United States

20  versus Reiner, 468 F.Supp.2d 393, from this district in

21  2006:  In the child pornography context, dangerousness

22  includes the ability if the defendant is released on bail

23  to attempt additional child pornography or to communicate

24  or to interact via internet, e-mail or phone with others

25  involved in the possession, sale and distribution of child

Proceedings

10

1    pornography or other sexual abuse of children, which would

2    create a clear danger by facilitating the criminal and

3    dangerous exploitation of children by other individuals.

4           The danger here isn't just that Mr. Valerio

5    could clip off the GPS monitor and harm a child but also

6    must encompass online dangers as well.

7           In this case Mr. Valerio has a very

8    long-standing history of hiding contraband, going back to

9    hiding the videos in a basement crawl space, to even more

10   recent hiding three different cameras in the basements of

11   the location where the six-year-old was photographed.  So

12   Mr. Valerio could easily hide a cell phone in any number

13   of places which would allow him to contact others online

14   and continue the abuse online.  That danger can only

15   effectively be dealt with by detention.

16          He previously acted in the case of the

17   three-year-old through a surrogate to have that

18   three-year-old molested.

19          In terms of the nature and the seriousness of

20   the danger posed by the defendant, the Government submits

21   there is no package that sufficiently can deal with those

22   dangers.  The suretors proposed here are insufficient, as

23   Mr. LaPinta indicated at the prior bail hearing in front

24   of Judge Brown that the defendant's mother has cognitive

25   deficits.  She's not a sufficient suretor, especially to

Proceedings

11

1   be the primary suretor.

2        I would note in terms of the bail package, I'll

3   reserve a reply as to what is exactly being proposed, your

4   Honor, but I would note in terms of the dollar amount of

5   the package, at this point you can see from the

6   superseding indictments the Government has brought a

7   forfeiture count as to Mr. Valerio's residence, so that

8   does decrease the amount of the property for the suretors.

9        In terms of the cases cited by the defense, your

10  Honor -- and I have to apologize.  I didn't get a chance

11  to write anything in response.  It came in late yesterday.

12  The Thomas case which was cited in the defense letter,

13  there's an error in the defense letter in that that

14  case -- I think it is listed as 2013.  It is actually a

15  2006 case.  And the conduct in Thomas dated all the way

16  back to 2003, I would note.

17       So I would submit in Thomas that defendant had

18  engaged in others online.  I submit the Thomas case, being

19  10 or 11 years old at this point, did not sufficiently

20  account for the online danger which your Honor has

21  recognized in the Reiner case.

22       I would also note in terms of Thomas, the

23  defendant Thomas didn't have the same history that

24  Mr. Valerio has in hiding contraband, the cameras in his

25  basement, the prior videos he had hid in the basement, and

Proceedings

12

1   have the backing of the surrogates to have the child

2   abused.

3           In terms of the Second Circuit authority, I

4   would note in the Orena case, 986 F.2d 628, in terms of

5   the Second Circuit here, in terms of Orena, the Second

6   Circuit rejected a request, in essence, for the defendant

7   to be incarcerated in his home, stating that these

8   conditions would at best elaborately replicate the

9   defendant's detention facility without the confidence of

10  security such a facility instills.

11          Safety of the community will be assured only if

12  the Government provides trustee-trained staff to carry out

13  the extensive monitoring of homes, telephone and travel

14  that would be necessary to ensure compliance with the

15  conditions of bail.

16          If staff were not provided, protection of the

17  community would be largely left to the word or the motto

18  that he will obey the conditions.  We find nothing in the

19  Bail Reform Act that requires the Government to allow home

20  detention or allow dangerous defendants to be at large

21  based on their promise not to violate the conditions of

22  bail.

23          In addition, I would note the Supreme Court --

24  the Second Circuit recently addressed Orena in an

25  unpublished decision, United States versus Baig, at 536

Proceedings

13

1   Fed.Apex 91, stating in United States v. Orena:  We

2   expressed serious reservation about the casualties for

3   home confinement as a substitute for detention in cases

4   involving violent crime -- which this is, your Honor --

5   noting problems of adequately monitoring and staffing home

6   confinement conditions.  We do not retreat from those

7   views.

8           Then they go on to distinguish the case here

9   from Orena.

10          I would also note there's a footnote 18 which

11  case the Government has not argued:  ...and therefore we

12  have no occasion to consider whether it would be contrary

13  to the principles of detention and release on bail to

14  allow wealthy defendants to buy their way out by

15  constructing a private jail.  We note, however, that in

16  the instant case the defendants lacking the resources to

17  flee might have been granted bail in the first place.

18          So to the extent that I need to preserve -- and

19  I'll make that argument as well, that Mr. Valerio -- the

20  proposal that I expect to hear from the defense in essence

21  would be Mr. Valerio trying to, as a wealthy defendant,

22  buy his way out by making himself a private jail.  And I

23  submit in any event that the private jail option, I

24  expect, would not sufficiently account for online danger

25  from a small electronic device which easily could access

Proceedings

14

1  the internet.

2          Turning to risk of flight, your Honor, I would

3  note the crime here charged involves one of the most

4  serious penalties available in district court:  15 years

5  minimum, as I said, 30 years maximum.  There are two

6  separate victims.  Guidelines are 360 to life.

7          Mr. Valerio is 47 and has prior cancer.  Given

8  all those serious penalties he faces, there is clearly a

9  preponderance that there is a flight risk here.  He has

10  shown disdain for probation monitoring previously, and his

11  mother, we submit, is unfit to be a surety.

12          Thank you.

13          THE COURT:  Okay.  Thank you, Mr. Bode.

14          I'll hear from Mr. LaPinta.

15          Yes, sir.

16          MR. LaPINTA:  Good afternoon, your Honor.

17          THE COURT:  Good afternoon.

18          MR. LaPINTA:  Your Honor, let me begin by

19  stating the obvious.  This is a child pornography case.

20  This is not a child rape case.  This is not a child sexual

21  contact case.  This is a case involving photographs or

22  videos of children.

23          It is a serious case, obviously.  It is a

24  troubling case.  However, the bail package that I'm about

25  to present to you, I would assert, is unprecedented in

Proceedings

15

1   this district and extraordinary in light of the

2   circumstances involved in the allegations and the ability

3   of a defendant to provide and address all of the bail

4   factors enunciated in 3142.

5           Mr. Bode has done an adequate job explaining the

6   law, and I don't need to do that.  I know that you know

7   that better than anybody here.

8           Clearly a presumption case.  However, the

9   defendant has the ability to rebut the presumption.  The

10  Government has the burden of persuasion by clear and

11  convincing evidence.  The Government has a limited burden

12  of production and not persuasion.

13          Let me address the factors in 3142, the nature

14  and consequences of the crimes charged.

15          Once again, no doubt, these are very serious and

16  troubling allegations.  However, the first series of

17  allegations involving the crime is overseas, in Ukraine.

18  The defendant is an aider and abettor.  He's alleged to

19  have communicated certain directives that the mother of

20  this child carried out.

21          The mother of this child is the principal actor.

22  She's located thousands of miles away.  The victim in this

23  case is thousands of miles away.  There is no realistic

24  opportunity for the defendant to have any contact with

25  this child.  And I'll mention in a bit other reasons why I

Proceedings

16

1  would assert that.

2          The instrumentality used to carry out that crime

3  was a computer.  No physical contact made by my client at

4  all.

5          Second series of allegations.  The allegations

6  are alleged to have taken place three years ago, not

7  recent.  They were videos that were obtained in a camera

8  that were previously deleted.  We don't know when they

9  were deleted.  They could have been deleted a minute after

10 they were taken.  It could have been deleted a day before

11 the FBI found them, a day before my client was arrested.

12 We don't know that.  The instrumentality here is a camera;

13 no physical contact is alleged.

14          I will address this.

15          There is no language in the initial complaint

16 about physical contact because there was redness on the

17 child's buttocks observed.  And the agent goes on to opine

18 that that was a product of spanking, and also taking a

19 step beyond by saying it was done for sexual gratification

20 and physical contact obviously being made.  That is at

21 best speculation.

22          There's not much different in the allegations

23 containing the Ukraine incident or the incident alleged to

24 have taken place in my client's basement.  The

25 instrumentality of the Ukraine was a computer.  The

Proceedings

17

1  instrumentality of the local charge was a camera.

2  Computer mouse was clicked.  The camera was clicked to

3  take the video.  No physical contact is alleged by my

4  client.

5        Two, the weight of the evidence against the

6  defendant.

7        I understand Mr. Bode's allegations, his opinion

8  about the evidence, the fact that he feels that he could

9  prove this case beyond a reasonable doubt, a doubt merely

10  by the e-mails and the videos.

11        My understanding of the allegations here, your

12  Honor, was that these videos are not time-stamped or dated

13  in any manner.  And the e-mails that accompany these

14  videos do have dates, but I think the essence of really

15  the production charge is when those videos were made and

16  whether they were made as a direct consequence of my

17  client's request that they be made.  That is the essence

18  of the production charge.

19        So insofar as proving guilt beyond a reasonable

20  doubt regarding production, I would say that the principal

21  actor's involvement would be an important one.  It may not

22  be necessary, but it may be important.

23        Obtaining her to participate in this case, in

24  light of the problems in the Ukraine, the civil war that

25  is taking place, may be very problematic for the

Proceedings

18

1    Government in sustaining their burden in going forward in

2    this case.  My understanding of it is she is not in

3    custody.  She is not somebody I would think would be a

4    willing participant to surrender herself.

5            There is no extradition agreement with Ukraine.

6    I feel the Government would have monumental problems in

7    having brought this jurisdiction to be either charged as a

8    codefendant or to be used as a cooperating witness in the

9    case against Mr. Valerio.

10           The more recent charges.  The minor victim in

11   the basement.

12           Once again, deleted video.  No allegation that

13   the video or photographs were disseminated.  No

14   allegations that they were reproduced or transported in

15   any way.

16           The child victim here, when interviewed by law

17   enforcement, did not say that Mr. Valerio took those

18   pictures of her.  And I understand the psychological

19   impact that child sex victims may have, and I understand

20   all of that.  But what we have here, for whatever reason,

21   whether it is denial, whether it is production or whether

22   it is actual innocence on behalf of my client, we don't

23   have the allegation made by the child that Mr. Valerio was

24   the one that did photograph her in the fashion she was

25   photographed.

Proceedings

19

1    History and characteristics of the defendant.

2    You should know, your Honor, that my client is

3    47 years of age. He was born in New York City. His

4    family, mother and father, are both Sicilian immigrants.

5    They bought a home in Queens when he was age six and moved

6    to Massapequa when he was a young child. Actually, I

7    misspoke. Lived in Queens previously and moved to

8    Massapequa when he was age six. They bought their first

9    family home then, and they resided in their family home in

10   Massapequa since, I believe, my client's sixth birthday.

11   He attended the Massapequa public school

12   district. He attended from the first grade to the twelfth

13   grade, and he graduated from Vernon High School in 1985.

14   After graduating from high school, he attended

15   studies at Nassau Community College. He took classes at

16   what is called an institution, that was previously called

17   the New Center, where he studied massage therapy.

18   He left college to work for his family business.

19   His father developed a marble/granite import/export

20   company. They established that business in Massapequa.

21   He left school to work with his father.

22   His father, his uncle, built that business up to

23   a very prominent business. He worked hand in hand in

24   developing that business. That business was sold in 2003.

25   And by virtue of hard work and devotion, his father has

Proceedings

20

1   the benefit of numerous assets that they are willing to

2   post to secure Mr. Valerio's release.

3           Before I get to that package of assets, let me

4   also explain that besides working for the family business

5   from 1986 to 2003, my client has also been involved and

6   has been very successful in real estate investment

7   ventures, both of a commercial and residential nature.

8   The family are devout Catholics.  He's a parishioner of

9   the St. Joseph's Roman Catholic Church in Smithtown.

10          He is divorced for the past six years.  He has

11  an 18-year-old son that attends college away from home.

12  His mother resides in Massapequa since 1988.  His father

13  passed away in 2010.  His father's loss has been

14  devastating to the family, and my client has assumed the

15  role, basically, as the leader, emotionally, financially,

16  and has been a provider for his mother and sister since

17  the death of their father in 2010.

18          His sister is present in court here today along

19  with her husband, and also my client's mother is present

20  as well.

21          Let me outline the assets that we have

22  previously submitted and approved by Magistrate Tomlinson.

23          The first property is Mrs. Valerio's property,

24  the mother.  That property is located in Massapequa.  She

25  has substantial assets, equity value, in that property.

Proceedings

21

1     She has executed a confession of judgment that was filed

2     with the Nassau County Clerk's Office.

3            The second property is his sister's property

4     that they've owned for a number of years.  They also have

5     significant equity involved.  A confession of judgment has

6     also been filed in the Nassau County Clerk's Office.

7            My client has a property in Smithtown that has

8     an equity value of roughly $800,000.  We filed a

9     confession of judgment with the Suffolk County clerk

10    regarding that property.

11           And there are two other commercial properties

12    owned by the family.  One is a commercial property located

13    on Broadway in Massapequa that previously housed the

14    family company of granite, tile and marble.  That business

15    is ongoing since it was sold to other relatives that have

16    continued the business and occupy that premises as the

17    primary tenants.

18           Also, there are other commercial tenants in that

19    building that does throw off a significant rent roll.

20    That property has been tendered, and a confession of

21    judgment has been filed in the Suffolk County Clerk's

22    Office.

23           Lastly, the family owns a residential property

24    in the Hamptons they've owned for a number of years.  A

25    confession of judgment has been filed in the Suffolk

Proceedings

22

1  County Clerk's Office in that regard, which has

2  substantial value.

3       The total conservative value of equity for all

4  of those property is $3.25 million.

5       Now, what is important to note, your Honor, is

6  that these are not distant relatives. These people are my

7  client's immediate family. This is what they own. This

8  is what his father has worked so hard to provide for his

9  family. And to think that my client would jeopardize or

10  risk his family losing all of these assets and to not come

11  to court here would be unrealistic and totally not the

12  case.

13       My client has significant health issues. He's

14  previously diagnosed with cancer. He had operative

15  surgery that removed one half of his thyroid. He's

16  undergoing continuous care to monitor that cancer.

17       His mother has had health issues. Suffered an

18  aneurism in 2009. She is medicated. I'm willing to

19  provide the Court with all medical records on behalf of

20  his mother to show that she does have the ability to be a

21  proper supervisor. She's here in court today.

22       I've had an incredibly close relationship with

23  her since the onset of these criminal charges, and albeit

24  I'm not a doctor, I'm not a psychologist, I'm not a

25  psychiatrist, but I will tell you that this woman is more

Proceedings

23

1   than capable of understanding what is happening.  She is

2   astute.  She has asked tremendously relevant questions.

3   She understands the proceedings, she is reliable, and she

4   is more than adequate as a supervisor for my client.

5        His sister is also present in court.  I've also

6   had a long-standing relationship with her on a continuous

7   basis since the onset of these charges, and she is more

8   than apt to be a supervisor and to undertake obligations

9   by the Court of whatever capacity you feel necessary to

10  assist in this bail package.

11       His brother-in-law is also in court here today.

12  He understands the nature of the charges, is willing to

13  post his house, as I previously said, and is more than

14  cable of being a supervisor in this instance as well.

15       My client has never once indicated to me any

16  type of suicidal ideation.  He has not even appeared to

17  me -- once again, I'm not an expert in this area -- has

18  never appeared to me to be distressed, despondent,

19  depressed in any manner.

20       There are no coconspirators here for him to act

21  together with, to further the production of child

22  pornography or to secret cell phones to him so he can

23  advance his fetish of child pornography, as the Government

24  would suggest.  The only person he has alleged to have

25  acted with is 3,000 miles away from this Court.

Proceedings

24

1        My client does have a prior criminal record,

2    albeit for the minor crime of a B misdemeanor, the least

3    serious crime noted in the Penal Law in New York State.

4    He did serve one year of probation pursuant to a bargain

5    for disposition.  You have the probationary notes present

6    there.  I've reviewed them.

7        I will tell the Court that there were never any

8    violations filed against my client.  He was never

9    penalized or sanctioned in any way for violating

10   probation.  He completed probation.  He never served a

11   term of incarceration on this matter, understanding the

12   nature of that charge and also understanding that it is a

13   fact that's the most minor crime that the New York State

14   Penal Law has on its books.

15       The nature and seriousness of the danger of the

16   community and to the individual.  I'm repeating myself,

17   and I will be brief.

18       The victim in the first allegation of said

19   defenses is well beyond the reach of the defendant.

20       The victim in the second allegation.  We'll make

21   part of this bail package that no minors under the age of

22   18 will ever be permitted in the Valerio residence in

23   Massapequa.

24       Let me articulate what I would categorize as

25   probably the most extraordinary bail package that could be

Proceedings

25

1    presented on any case, albeit a case of this nature.

2          In addition to having the proposed properties

3    I've mentioned filed already totaling $3.25 million, we

4    have gone to the length of having the premises, the

5    Valerio premises in Massapequa, equipped with

6    state-of-the-art surveillance system that is recording

7    every perimeter or area outside of the property. It is

8    equipped in the fashion that provides the FBI with live

9    feed of the video. We made sure that that specific

10   security system was approved by the FBI.

11         Prior to my client being released on bail, a

12   home search was conducted by the FBI and also pretrial

13   services. The security system was investigated,

14   evaluated. The brains of the system, so to speak, the

15   computer of the system, is held in a locked box in a

16   locked room. It has a power surge that will allow for

17   continuous recording if there is electrical outage. If

18   there is such an electrical outage, the FBI will be

19   notified immediately of that.

20         We have agreed to enormous conditions regarding

21   home confinement, having my client equipped with not only

22   an ankle bracelet but one that is monitored by GPS. We've

23   agreed that the residence would not house a computer or

24   any other electronic device - cell phone, iPAd, no

25   internet access of any sort as well.

Proceedings

26

1        We've agreed to have my client present, be

2   present, at pretrial services anytime that the Court would

3   feel comfortable with, whether it is on a weekly basis,

4   biweekly basis or otherwise.

5        We will agree to random home searches and visits

6   by not only pretrial services but also the FBI, anytime of

7   day or night.

8        As I previously explained, we will agree no

9   child under the age of 18 will be permitted inside that

10  house.

11       Alcohol and narcotics condition are a foregone

12  conclusion.

13       Pretrial services has previously interviewed and

14  screened people that will be residing with my client and

15  who will be having direct contact with him. I will go a

16  step beyond that and offer to the Court a list of people

17  that will only be permitted to enter into that house, and

18  I will tell the Court that anyone else besides people on

19  that list will not be permitted to enter that house under

20  any circumstance, unless previously approved by the Court.

21       Over and above those extreme conditions, we've

22  reached out to and have secured a security company that is

23  capable of providing 24-hour, seven-day-a-week security of

24  the Valerio residence.

25       The principal of that security company is

Proceedings

27

1  present in court. He's available for inquiry by the Court

2  of any question you deem appropriate; that you may inquire

3  to satisfy the Court that, one, they are not only licensed

4  in New York State to perform security, two, they are

5  bonded. They have extreme experience in this regard, and

6  they have worked hand in hand with law enforcement - FBI,

7  state and local police - on numerous occasions in the

8  past.

9          The persons that would be responsible for

10  actually securing the premises are all loyal personnel

11  that have been screened and have been long-standing

12  employees of the company.

13          We are willing to have every person that enters

14  and exits the house searched, pat-down searched, sign in a

15  log.

16          We are more than willing to have security

17  personnel have constant contact with the FBI.

18          We're willing to have the security company make

19  their records available to the FBI at any given time, even

20  randomly if necessary.

21          We are willing to have a direct line to the FBI

22  if there is something that goes awry so they are aware of

23  it instantaneously.

24          The package that I'm presenting to you, your

25  Honor, is unprecedented and extraordinary. There are no

Proceedings

28

1   other assurances that could be possibly offered to the

2   Court in this regard; as substantial of a bail package as

3   anyone can put together.

4          Denying this package would be tantamount to

5   saying that defendant charged with these crimes, child

6   porn crimes, nontouching, noncontact crimes, could never

7   be released on bail.

8          Lastly, I have the suretors present in court.

9   There has been a change in circumstances since they've

10  signed the surety bond.  There has been other charges

11  presented.  They are aware of those charges, and they are

12  more than willing to continue offering their properties as

13  bail in this regard.

14         With that said, I thank you for your time.

15         THE COURT:  Let me ask you a couple questions.

16         Do you want to talk to Mr. LaPinta for a second,

17  Mr. Lato?

18         MR. LATO:  Yes, your Honor.

19         Your Honor, may we have two minutes, please?

20         THE COURT:  Sure.

21         MR. LaPINTA:  Your Honor, with your permission,

22  I'll have Mr. Lato address some other conditions.

23         THE COURT:  Yes.

24         MR. LATO:  Plus, Mr. LaPinta is losing his

25  voice, so it might be easier.  And I want to rebut some of

Proceedings

29

1    the things that Mr. Bode has said.

2            However repugnant the crimes, as the Court

3    stated in Madoff, we must look forward.  And in terms of

4    bail, it is whether the defendant is currently a risk of

5    flight, currently a danger to the community, and does this

6    substantial bail package, looking forward, reasonably

7    assure the safety of the community and guard against the

8    risk of flight.

9            Mr. Bode talks about the defense have all of

10    these assets and can buy his way out.  Mr. Bode's argument

11    on that point is irrelevant.  There is no such thing as a

12    reverse equal protection argument, that if poor people

13    have to stay in, so does a wealthier person.

14            If this bail package is big enough to reasonably

15    assure the safety of the community and reasonably guard

16    against the risk of flight, if the Court finds that, the

17    Court must release him irrespective of how unfair that

18    would be to people of lesser means.

19            Mr. Bode cites Orena.  That case, as I stated in

20    the letter to the Court, is also irrelevant because Orena

21    and those line of cases deal with organized crime bosses

22    who, by virtue of having a conversation, can order a hit

23    on another person.  Or jury tampering.  That is not this

24    type of a case.

25            Cell phones and computers.  There are none in

Proceedings

30

1    the house that is always subject to search by the FBI,

2    with the video cameras and the live feed to the FBI, and

3    security guard. And I will use the adverb "reasonably,"

4    or I'll make it an adjective, "reasonable." There is no

5    reasonable basis to believe that a cell phone or a

6    computer or a camera can get into the house when every

7    person who enters that house must be on a preapproved list

8    and subject to search. Even the mother, the owner of the

9    home, if she leaves the house, when she comes back in will

10   be subject to search.

11         There is no reasonable basis to believe that

12   someone, however creative, can smuggle a camera or a

13   computer into the house.

14         With respect to the guideline range, perhaps

15   this is an immaterial point. Mr. Bode says the range is

16   360 months to life. I come out with a slightly lower

17   range of 292 to 365 months. That is probably immaterial

18   in terms of what the Court must consider, but given that I

19   have a different view, I figured I would just say it.

20         If Mr. Valerio is guilty, this Court is going to

21   sentence him to a very long jail sentence. That is not a

22   reason now to deny a person bail if he can reasonably

23   assure through his package that he will not flee or pose a

24   danger to the community.

25         THE COURT: I have a couple of questions. I

**Proceedings**

31

1    don't know if you want to answer them, Mr. LaPinta.

2              MR. LaPINTA:  Either one.  I'll try.

3              THE COURT:  On the issue of the weight of the

4    evidence, you mentioned the issue whether or not the

5    child, the first child, the three-year-old, whether it is

6    evidenced in the letter, whether you'll be able to

7    demonstrate the child was exploited.

8              But my general question is:  Mr. Bode proffered

9    the Government's proof as a whole in terms of the

10   possession of child pornography - possession, search, the

11   videos that were recovered - and I haven't heard any

12   response to that evidence what explanation there is going

13   to be for all the other evidence in the case, other than

14   whether or not the child was exploited before or after

15   requests were made for images.

16             What is your defense for the rest of the case?

17             MR. LaPINTA:  One moment, please.

18             (Counsel confer.)

19             MR. LATO:  Your Honor, just so I understand the

20   question, or that we do, is your Honor questioning can we

21   rebut the claim that the video in the Ukraine were done in

22   response to the defendant's direction --

23             THE COURT:  I understand you believe -- and you

24   may be able to dispute that, they will not be able to

25   prove that without the witness, but my question is:  With

Proceedings

32

1   respect to the rest of the charges in terms of even

2   possession, receipt of the images, what is your defense to

3   that part of the case?

4           MR. LATO:  The Government has a strong case to

5   that.  There is no question with respect to the receipt of

6   the images from Ukraine.

7           However, there is no 15-year minimum there.  The

8   minimum there is five years, which makes this a very

9   different case.

10          THE COURT:  What is your response to Mr. Bode

11  saying that the images don't have time stamps on them;

12  that he believes it will be clear from what was requested

13  and what was sent back?

14          MR. BODE:  Your Honor, they are attached to

15  e-mails.  He says:  Can you do this?

16          She'll send back an e-mail with the kid doing

17  that.

18          MR. LATO:  And that is certainly from Mr. Bode's

19  standpoint, I understand, an excellent argument, but this

20  is the give-back.  It is going to be very difficult in my

21  view for a jury to believe that a mother who has never

22  abused her kid or done any of this, just from 5,000 miles

23  away, says, sure, I'll make these videos for you.

24          A more likely scenario is the mother has been

25  doing this for awhile, probably had a library of pictures.

Proceedings

33

1    And who is to say whether she has turned over pictures

2    that she made for the defendant or she already had in her

3    library.

4           And in my view, we'll never find out for sure

5    because there is no way this woman will voluntarily come

6    to the United States.

7           Your argument is, on the weight of the evidence,

8    the six-year-old victim has denied that the defendant ever

9    took the pictures?

10          MR. LaPINTA:  Yes.

11          MR. LATO:  Yes.

12          THE COURT:  So again, the Government obviously

13   has the pictures.  They've proffered the camera system

14   that they found during their search.

15          What is the explanation for it?

16          MR. BODE:  If I can, your Honor, before we do

17   that, so the Court is clear, I don't know if the Court had

18   a chance to read the complaint.  The six-year-old victim

19   identified the outfit, said the defendant took pictures of

20   her.  And talking about the nonchild pornography pick, but

21   they are in series.  In the later pictures she's

22   photographed nude.

23          So she has identified those pictures.  She did

24   indicate that the defendant took those pictures.

25          In fact, the parents of the child indicated that

Proceedings

34

1    the defendant built the stage --

2         THE COURT:  I'm confused.  What did she deny?

3         MR. BODE:  She was asked "Did he take nude

4    pictures of you?" and she denied that, which as we

5    indicated in the complaint is very common of children

6    abused at such a young age, especially when offenders

7    often either threaten or coach.  It is very common for the

8    children not to disclose.

9         THE COURT:  And you recovered them.

10        MR. BODE:  We have the actual images, and they

11   are in sequence.  The parents indicated that the defendant

12   has indicated to them he was taking modeling pictures of

13   the defendant as well.

14        MR. LaPINTA:  Clothed modeling pictures, your

15   Honor.

16        THE COURT:  But again, circumstantial evidence

17   that he was involved in those.  Who was involved in the

18   others if it was not him?  That is the question.  Begin

19   where they were found, and the sequencing and the other

20   evidence.

21        MR. BODE:  And the hidden cameras, the

22   explanation for the hidden cameras in the floor, in the

23   closest --

24        THE COURT:  I didn't need help, Mr. Bode.

25        MR. BODE:  Sorry, your Honor.

Proceedings

35

1    MR. LATO: May I, your Honor?

2    THE COURT: Yes.

3    MR. LATO: The explanation that I can proffer --

4    and I don't want to get into too much at this point.

5    THE COURT: You don't have to proffer anything.

6    MR. LATO: But I will say the following. There

7    is no question that the Government's evidence that the

8    defendant took the pictures of the clothed girl is

9    insurmountable. There is no question that she admitted

10   that in the complaint to the agent. But as I stated in my

11   letter, it is also common for people who have not been

12   photographed naked to deny they've been photographed

13   naked.

14   And who is to say that the video or the pictures

15   were taken by one person or two or three?

16   THE COURT: When the girl denied that he took

17   the other photographs, did she say who took them if he did

18   not take them?

19   MR. LATO: I don't know if that was ever asked.

20   MR. BODE: It's a sequence of photos. In the

21   beginning he took the video of her. She actually

22   described the camera as well -- same type that were used

23   to create the images -- and indicated that he had her

24   dress up in the outfits. And after she described them,

25   she was showed photos of the outfits found in the basement

Proceedings

36

1    as well.

2          MR. BODE:  And then she is asked:  "Did he ever

3    take naked photos of you?"

4          She denied.

5          THE COURT:  Did she indicate if he did not?

6          MR. BODE:  She was asked:  "Did he ever take

7    naked photos of you?"

8          I don't think she was ever asked.

9          MR. LATO:  By default, your Honor, the answer

10   is, no, she was not asked.

11         THE COURT:  My other question relates to the

12   security service.  I don't understand -- and I don't need

13   all the details of it, but how will they follow the

14   defendant around the house?

15         I understand they will search people who come

16   in.  But will there be a team of security people who

17   follow him throughout the house, from room to room?

18         MR. LATO:  Your Honor, may I have a moment with

19   Mr. LaPinta?

20         MR. LaPINTA:  Your Honor, it's not a system that

21   will be inside the house.  It will be outside the house.

22         THE COURT:  You were talking about the camera or

23   the person?

24         MR. LaPINTA:  The person and the camera.

25         THE COURT:  I understand the camera.  Where is

Proceedings

37

1    the person?

2            MR. LaPINTA:  The person will be positioned,

3    presumably in a car, outside the house 24-7, monitoring

4    who comes in, who comes out, and searching those people.

5            That was a product of Mr. Bode's concern in

6    reargument before the Court made to Judge Brown, that he

7    would be concerned people would be bringing cell phones

8    into the house so he could access --

9            THE COURT:  Putting aside that issue, the aspect

10   of flight, who is preventing anyone coming into the house,

11   cutting the bracelet off and running away from the house?

12           MR. LaPINTA:  Presumably the security guard

13   outside the house.

14           THE COURT:  One guard outside will prevent the

15   defendant fleeing from any exit and can flee the house?

16   Doesn't sound very secure to me.

17           MR. LaPINTA:  That's a great question.

18           This is a waterfront property.  So unless he

19   jumps in the canal and swims away, there is only one way

20   getting outside the house:  From the front.

21           There's a back door, a front door and garage.

22   But if you want the security personnel to do perimeter

23   searches on a regular basis --

24           THE COURT:  On this particular point, there is

25   an issue of flight.  GPS and electronic monitoring is

Proceedings

38

1  useful, but for someone who wants to flee, I don't

2  understand how someone can't flee from another exit of the

3  house.

4      MR. LaPINTA:  He has $3.5 million worth of

5  reason not to flee, your Honor, and he's not going to

6  devastate his dear family members in that regard.

7      THE COURT:  All right.  Mr. Bode --

8      MR. LATO:  Your Honor, I just wanted to add --

9  and Mr. Bode is always free to modify his view.  But if I

10  recall correctly -- and he can correct me if I'm wrong --

11  that Mr. Bode is proceeding principally on danger to the

12  community, not on risk of flight, given that realistically

13  even in the defendant could somehow cut off the bracelet

14  and run, there is no place -- he couldn't get very far

15  before he would be caught.  The danger aspect is the

16  issue, your Honor.

17      MR. BODE:  Your Honor, what I say is I do rely

18  on flight, but I don't think we'll ever reach that

19  question.  The danger to the community is such that it

20  cannot be adequately dealt with by the conditions set

21  forward here.  Because of the danger, we don't need to go

22  to the issue of flight.

23      You can simply clip off a bracelet.  Numerous

24  ways you can get out of a house that you can't get out of

25  jail.  And in the Northern District, the defendants

Proceedings

39

1  clipped off their monitors.  And the damages would be more

2  drastic in a case such as this.

3      Other things that I would mention were mentioned

4  previously.  I would note that the defendant here acts

5  through surrogates, like Orena.  And, frankly, his history

6  of hiding contraband, of lying to probation officers and

7  defeating the monitoring is what makes this case such that

8  the defense cannot rebut the issue.

9      THE COURT:  I'll place the Court's ruling on the

10  record.

11      I've carefully considered the arguments and

12  submissions of both sides.  And having done that -- and

13  I've looked at this de novo.  I know there has been a

14  history with Judge Tomlinson and Judge Brown, but I'm

15  looking at this completely fresh, in a de novo review.

16  And I'm detaining the defendant as a risk of flight and a

17  danger to the community for the following reasons.

18      First, with respect to danger to the

19  community -- and this is a presumption case -- I find the

20  Government has met its burden, even without the

21  presumption, that the defendant is a danger to the

22  community by clear and convincing evidence, such that no

23  conditions or combination of conditions of release,

24  including the extensive conditions proposed here, can

25  reasonably assure the safety of the community.

## Proceedings

40

1    Just going through the factors first, the nature

2    and circumstances of the crime charged.

3    Extremely serious crimes here, crimes of

4    violence, aiding and abetting of a woman who sexually

5    exploits her own child, a three-year-old child, and to

6    send the videos to the defendant.

7    You have a second series of charges related to

8    the sexual exploitation to a second child, a six-year-old

9    girl, in his home. And I emphasize "in his home."

10   The fact that there is not an allegation of

11   physical contact that the defense argues, in my view, does

12   not undermine the extreme -- and I underline "extreme" --

13   danger posed by this type of alleged criminal activity,

14   with the use of a camera or a computer, can result in the

15   exploitation of a child, independent of whether or not

16   that particular defendant physically touched the child.

17   And there are numerous examples of that to even

18   outline here.

19   I think it is self-evident that in this area of

20   child pornography, that the instrumentalities of cameras

21   and computers can result in extreme danger to children, in

22   a horrific exploitation of children.

23   For that reason I find this to be serious

24   charges with respect to crimes of violence, an extreme

25   danger to societies created by this type of alleged

Proceedings

41

1    conduct.

2           In terms of the weight of the evidence, given

3    Mr. Bode's proffer -- and that's why I asked follow-up

4    questions to defense counsel. I believe this is an

5    extremely strong case. There are portions of this case

6    related to the possession of the child pornography for

7    which I have heard no response in terms of the

8    Government's overwhelming case, overwhelming evidence with

9    respect to those.

10          On the issue of whether or not -- to be clear on

11   that, that the Government has proffered both evidence from

12   the search, evidence from the search of the home, the

13   computers, including e-mails, as well as his confession,

14   and those make this an extremely strong case.

15          In my view, the child's denial with respect to

16   some of the images, under the circumstances, and other

17   evidence that the Government has does not seriously

18   undermine the weight of their case. Nor does the fact

19   that the Ukraine mother is made unavailable to them, in my

20   view, in any significant way undermine the other

21   overwhelming evidence they would proffer with respect to

22   various aspects of the charges and the conduct in the

23   case.

24          As far as the history and characteristics of the

25   defendant, this warrants a finding of danger based on --

Proceedings

42

1    not only with respect to the crimes charged but the

2    attempted forcible touching, although a misdemeanor, in my

3    view is a serious offense and is heightened given the

4    particular charges in this case as it relates to this

5    defendant.

6            So to summarize, in terms of danger, every

7    single factor, in my view, favors detention based upon

8    danger to the community.  I obviously have analyzed in

9    great detail whether there are any conditions that I could

10   think of or is more specifically, even the ones that have

11   been proposed here, which I certainly agree are extensive.

12           But I just want to say something regarding what

13   Mr. Lato said:  If their defendant didn't get to bail --

14   maybe it was Mr. LaPinta -- no one who possesses child

15   pornography will ever get bail.

16           In fact, I have a number of cases where

17   defendants have been charged with possession of child

18   pornography who are on bail subject to some of the types

19   of restrictions they have proposed here.

20           This case is different than those cases.  We

21   have a -- serious as that conduct is, a possession of

22   child pornography, the conduct alleged here is far more

23   serious than that, which is the danger which I indicated

24   in Reiner.

25           On the issue of bail package, as Mr. Bode

Proceedings

43

1    pointed out, first of all, the Second Circuit has made

2    clear in the Orena decision it is not the job of the

3    Government, the FBI agents, in monitoring cameras 24 hours

4    a day, that resources be dedicated to that to try to

5    replicate a jail.  In that defendant's case, the Orena

6    case makes that clear.

7            And that is essentially what the defense is

8    trying to do, trying to replicate a jail in the home.

9            However, even assuming as Mr. Lato argued today,

10   the Second Circuit has reserved on if the defendant were

11   wealthy enough to replicate a jail in his home, he should

12   be able to do that.

13           Assuming that for present purposes,

14   notwithstanding Orena, in my view, this is a highly

15   imperfect replication of a jail on the issue of danger

16   because, as Mr. Bode noted, given this defendant's past

17   history that has been proffered in terms of deceitful

18   conduct, in terms of things hidden in crawl places and

19   walls, independent search that has been already done in

20   the home, or could be, doesn't take much to hide a cell

21   phone or any type of electronic device somewhere in a

22   home.  I don't think one could be certain that one is in

23   there, in some hidden spot in the home.

24           Even if you went into a list of people who would

25   come in, are dependent upon each of those persons not

Proceedings

44

1    making decisions, even if they don't want the defendant to

2    harm someone, trying to give him some access to a phone or

3    electronic device.  So you don't have those issues in

4    jail, where people are visiting or coming into the home.

5            And you are dependent also on a security company

6    where, even if the FBI has approved previously, is not the

7    equivalent, in my opinion, of security measures that exist

8    in a jail for all visitors to prevent such type activity.

9            Given that he can, through the use of a computer

10   or a cell phone, engage in dangerous activity as relates

11   to child pornography and related offenses, I don't believe

12   the proposed package can reasonably assure the safety of

13   the community, the safety of children in the community,

14   and for those reasons I find it is inadequate.  And I

15   can't think of any other conditions that would be able to

16   be added to that package.

17           Also, the defendant would be free in the house.

18   If there was a computer device or if there was a phone,

19   there is no ability to know what he's doing in the house

20   with respect to that once they got in, unlike the jail.

21           On the issue of flight, also, I agree.  To me,

22   the issue of danger is the primary issue in this case.

23           The Government has met its bail package that

24   those conditions could reasonably assure that this

25   defendant would appear in court under the factors that

Proceedings

45

1    they would apply in this case.  He's 47 years old.  He's

2    taking Mr. Lato's calculation of the guidelines.  Even in

3    taking that, he's looking at, in the guidelines, 292

4    months at the low end, 15-year mandatory minimum.

5         He has health issues.  It has been proffered

6    that he makes statements regarding the desire to kill

7    himself.  And certainly someone in that situation, who has

8    an extremely strong case against him -- if the defendant

9    wants to flee, notwithstanding those conditions,

10   notwithstanding a guy sitting in a car in front of the

11   house, notwithstanding an electronic bracelet, the

12   Government would know that a bracelet was cut off.  And by

13   the time they reacted to that, the defendant would be

14   anywhere he wanted to be.  And that might be a very hard

15   thing, to locate him once he's free of the confines of

16   that house.

17        So the electronic bracelet and the GPS, because

18   it can be cut off, is in no way, in my view, to prevent

19   someone from fleeing.

20        To the extent they argued the 3.2 million

21   dollars will prevent him from doing so, I don't know what

22   the defendant's current state of mind is, given what I

23   just said about how much time he's looking at and the

24   weight of the evidence against him.  I don't know how much

25   moral suasion his mother and relatives have over him at

Proceedings

46

1   this point.  There is no way to know whether or not they

2   have moral suasion, and the money his family would lose

3   would be enough to prevent him from what I would think

4   would be an extremely high-risk situation in just deciding

5   he doesn't want to spend the length of time in jail that

6   he would be potentially looking at if convicted.

7           For all those reasons, I believe the Government

8   has met its burden by a preponderance of the evidence that

9   these conditions and that no conditions can reasonably

10  assure that he will face the charges in this case, and

11  therefore I'm detaining defendant, pending trial, upon

12  those grounds.

13          Obviously, when Mr. Valerio is prepared to go to

14  trial, you can suggest a date.  And I understand he's

15  obviously in jail awaiting trial, and he can go to trial

16  as quickly as his attorneys are ready to proceed.

17          MR. LATO:  May we just have a moment to consult

18  with the Government?

19          THE COURT:  What do you want to do in terms of a

20  date going forward?

21          MR. BODE:  Judge, the defendant is not waiving.

22  So if you can put it on for trial on May 12th.  Is that

23  good for the Court?

24          THE COURT:  What date do you want?

25          MR. LaPINTA:  May 12th, your Honor.

Proceedings

47

```
1          THE COURT:  I haven't done the math.  That's
2   within the 60 days?
3          MR. BODE:  60 days would be the 5th of May, so
4   that is 67 days.
5          THE COURT:  You are talking about not from
6   today?
7          MR. BODE:  There was a waiver earlier to today.
8          THE COURT:  So the trial is scheduled for
9   May 12th at 9:30.
10          Obviously, if you want to make motions, you will
11   figure out a schedule to make motions consistent with that
12   date.
13          MR. LaPINTA:  Do you have any preferences?
14          THE COURT:  I don't.
15          MR. LaPINTA:  Obviously, if there are issues
16   that come up and we decide to waive, we'll notify the
17   Court.
18          THE COURT:  Notify me immediately because I'm
19   reserving that space.
20          MR. BODE:  If I could notify the Court orally
21   that we unseal the search warrants to defense counsel
22   and --
23          THE COURT:  Yes, I grant the motion to unseal
24   the search warrant application for purposes of producing
25   the defendant.
```

## Proceedings

48

1         MR. BODE:  Thank you.

2         MR. LaPINTA:  Thank you, your Honor.

3         (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25